**Tasfa Wolde WALLACE,
Petitioner/Plaintiff,**

v.

**Janet RENO, Attorney General, Doris Meissner, Commissioner of the Immigration and Naturalization Service, Department of Justice, and Steve Farquharson, District Director, Respondents/Defendants.**

**No. CIV. A. 98–11182–NG.**

United States District Court,
D. Massachusetts.

Oct. 7, 1998.

---

Randy Olen, Providence, RI, for Tasfa Wolde Wallace, Plaintiff.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

The petitioner/plaintiff, Tasfa Wolde Wallace ("Wallace"), is an immigrant from Jamaica who first entered this country ten years ago. Just over two years ago, he pleaded guilty to a drug offense, on the basis of which he is automatically subject to deportation. Wallace now comes before this Court, seeking the opportunity to ask an Immigration Judge ("IJ") to take into consideration not just his one crime, but also the humanitarian and social factors that weigh against his expulsion from this country.

The Respondents contend that, due to changes in the immigration laws enacted after Wallace had pled guilty he is no longer entitled even to ask for such discretionary humanitarian consideration. I reject that contention on the basis of the First Circuit's recent holding in *Goncalves v. Reno*, 144 F.3d 110 (1st Cir.1998). For the reasons set out below, Wallace's petition is **GRANTED**.

## I. FACTS

Wallace is a native and citizen of Jamaica. He entered the United States as an immigrant on May 10, 1988. It appears that he entered lawfully and resided lawfully as a permanent resident.

On February 15, 1996, however, Wallace pleaded guilty to the offense of possession of marijuana with intent to deliver in the Providence Superior Court, Providence, Rhode Island. He was sentenced to ten years imprisonment, three years to serve, seven years suspended, and seven years probation.

Wallace's guilty plea had severe immigration consequences, unknown to him at the time. As an "aggravated felon" and alien convicted of a controlled substance offense, he suddenly became deportable from this country, with no possibility of return. Immigration and Nationality Act ("INA") §§ 241(a)(2)(A)(iii) and 241(a)(2)(B)(i), 8 U.S.C. §§ 1101(a)(43), 1182(a)(2)(c), 1251(a)(2)(A)(iii), 1251(a)(2)(B)(i). Nevertheless, at the time Wallace chose to plead guilty, discretionary relief for deportation under INA § 212(c), 8 U.S.C. § 1182(c) was still available to him. Within months, however, the law would change and even the avenue for relief from deportation would be off, at least prospectively.

One month after Wallace's conviction, on March 18, 1996, the INS issued an Order to Show Cause ("OSC"), which it served on Wallace two days later. The OSC informed Wallace that he was deportable because of his conviction and ordered him to appear for a hearing before an Immigration Judge to show cause why he should not be deported. The Office of the Immigration Judge would schedule a hearing date, the OSC stated, and give Wallace notice of it by mail.

After serving Wallace with the OSC, the INS took no action on his case for almost three months. Finally, on June 14, 1996, the INS filed the OSC with the Office of the Immigration Judge ("Immigration Court") in Boston.[1]

Wallace's first hearing was not held until December 18, 1996. At that first hearing, Wallace admitted to the facts of his conviction and conceded deportability. He also indicated his desire to apply for discretionary relief from deportation under INA § 212(c), based on his ties to this country.[2] The hearing was continued until August 19, 1997.

---

1. The Office of the Immigration Judge is part of the Executive Office for Immigration Review ("EOIR"), the branch of the Department of Justice charged with hearing and deciding immigration cases such as Wallace's. The EOIR is, formally, a separate agency from the INS.

2. As discussed in more detail below, § 212(c) allowed a deportable alien to seek a discretionary

At Wallace's final August hearing, the Immigration Judge refused to hear his request for discretionary relief, finding that amendments to § 212(c) enacted in April of the previous year had made him ineligible to apply. Accordingly, the IJ found Wallace deportable on the basis of his criminal conviction and ordered him deported to Jamaica. Wallace appealed this decision to the Board of Immigration Appeals ("BIA"), which, on May 5, 1998, affirmed the IJ's decision that he was ineligible for § 212(c) relief.

Because Wallace is considered an "aggravated felon," he is barred by recent amendments to the immigration laws from seeking any direct judicial review of the BIA's decision that he is ineligible to apply for § 212(c) relief. INA § 106(a)(10), 8 U.S.C. § 1105(a)(10) (amended by AEDPA § 440(a)); *Kolster v. INS*, 101 F.3d 785, 786 (1st Cir.1996). He brings this habeas petition before this court, arguing that the BIA's finding of ineligibility was both erroneous as a matter of statutory interpretation and unconstitutional as applied in his case. He asks this Court to direct the BIA to consider his request for relief from deportation.

Put simply, all he seeks through this petition is the opportunity to be heard.

## II. DISCUSSION

### A. Discretionary Relief From Deportation under INA § 212(c)

Wallace's deportability is not in doubt. At the time Wallace was convicted of possession of marijuana with intent to distribute, the INA provided that any alien convicted of any controlled substance offense at any time after entry was deportable. INA § 241(a)(2)(B), 8 U.S.C. § 1227(a)(2)(B).[3] Wallace's only defense against deportation was therefore to seek discretionary, humanitarian relief on the grounds of his long residence here and his ties to this country. His petition hinges on whether, after the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No.

104-132, 110 Stat. 1214, on April 24, 1996, that relief is still available to him.

Until recently, a request for the humanitarian relief Wallace seeks was made by applying for a waiver of "excludability" under INA § 212(c), 8 U.S.C. § 1182(c). INA § 212(c) provided:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years may be admitted in the discretion of the Attorney General ...

*Id.* Although the section appears on its face to make relief available only to resident aliens facing "exclusion" at the border upon return from trips abroad, it has long applied with equal force to lawful residents facing deportation. *See Francis v. INS*, 532 F.2d 268, 273 (2d Cir.1976); *Matter of Silva*, Int. Dec. 2532 (BIA 1976) (adopting *Francis* nationwide); *Campos v. INS*, 961 F.2d 309, 313 (1st Cir.1992) (adopting *Francis* and *Silva* in the First Circuit). In other words, it would have applied to Wallace.

The decision whether to grant § 212(c) relief was a discretionary one, based on a balancing of equities, including the alien's length of residence here, especially if it began at a young age, her family ties, the hardship to the alien if deported, proof of rehabilitation, work history, military service to this country, ownership of a business or property here, and any other evidence of her good character and value to the community and the nation. *See Matter of Marin*, 16 I. & N. Dec. 581, 584-85 (BIA 1978). Apart from his long residence here, the record does not reflect what Wallace's equities are, because he was never allowed to apply for § 212(c) relief.

Prior to AEDPA, even an alien convicted of an "aggravated felony," such as drug trafficking, could apply for § 212(c) relief unless he had served five or more years in prison

---

waiver of deportation based on his ties to this country and his contributions to his community. *See e.g., Matter of Marin*, 16 I & N Dec. 581, 584-85 (BIA 1978).

3. Other than a single offense of possession of 30 grams or less of marijuana for personal use. *Id.*

for the felony.[4] 8 U.S.C. § 1182(c) (1996). Although the record does not reflect exactly how much time Wallace served, he was only sentenced to three years imprisonment. It thus appears undisputed that he would have been eligible for § 212(c) relief.

With the passage of AEDPA, however, several classes of criminal aliens were barred relief. The new § 212(c) concluded:

> This section shall not apply to an alien who is deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) [aggravated felony], (B) [controlled substance offenses], (C) [firearms offenses], or (D) [offenses against national security], or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i) [crimes of moral turpitude].[5]

AEDPA § 440(d), 110 Stat. 1214, 1277. AEDPA thus removed the five-year sentence requirement. It now barred relief for any alien convicted of any aggravated felony, regardless of the time served. *Id.*[6]

### B. *Retroactivity*

■ Wallace was served with an Order to Show Cause on March 20, 1996, charging him with deportability on the basis of his February 1996 conviction. AEDPA was not enacted until April 24, 1996. Whether Wallace is still eligible to apply for § 212(c) relief therefore depends primarily on the extent to which AEDPA § 440(d) can be applied retroactively.

#### 1. *The First Circuit's Decision in Goncalves*

In approaching this question, I am guided by the First Circuit's recent in-depth consideration of the retroactivity of AEDPA § 440(d) in *Goncalves v. Reno*, 144 F.3d 110. Goncalves, like Wallace, was a long-term permanent resident alien who had committed a criminal offense that rendered him deportable. He was placed in deportation proceedings and, in September 1994, applied for § 212(c) relief. In January 1995, the Immigration Judge in Goncalves' case found that he was eligible for the relief but that, as a matter of discretion, he did not deserve it. Goncalves appealed this decision to the BIA. *Id.* at 114.

Goncalves faced even lengthier delays than Wallace. Although he appealed to the BIA in early 1995, his appeal was not decided until March 24, 1997. By that time, of course, AEDPA had been passed, rendering aliens with criminal records like Goncalves' ineligible for § 212(c) relief. Although the BIA itself had initially concluded that the new restrictions on § 212(c) should not be applied to § 212(c) applications filed prior to April 24, 1996, by the time it came to consider Goncalves' appeal, that decision had been reversed by the Attorney General. *Matter of Soriano*, Int. Dec. 3289, 1996 WL 426888 (Op. Att'y Gen. June 27, 1996). The BIA was therefore constrained to dismiss Goncalves' appeal on the grounds that he was now ineligible to apply for the relief he had been seeking for over two years. *Goncalves*, 144 F.3d at 115.

The First Circuit reversed the District Court's dismissal of Goncalves' petition for a writ of habeas corpus and remanded the case to the BIA for a discretionary determination of the merits of the application for relief under the old INA § 212(c). *Id.* at 134. It noted that § 212(c) relief, although discre-

---

4. When the ground of deportation was a conviction for drug trafficking, however, the alien had to show "unusual or outstanding equities." *Matter of Marin*, 16 I. & N. Dec. at 589. As mentioned above, because Wallace has not yet been able to apply for § 212(c) relief, there is no record of what his unusual or outstanding equities might be.

5. Wallace was thus denied relief on the basis of his controlled substance conviction, which was also an aggravated felony under the immigration laws. Goncalves, potentially barred relief by the same section, had committed two crimes of moral turpitude. *See Goncalves*, 144 F.3d at 112.

The court, for the reasons described, nevertheless remanded his case to the BIA for a hearing on the merits of his § 212(c) application.

6. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) passed after AEDPA has eliminated INA § 212(c) relief entirely. IIRIRA, Subtitle C, amending 8 U.S.C. § 1182. That provision, however, was expressly prospective, applying, like most of the statute, to deportation proceedings commenced after April 1, 1997. IIRIRA, § 309(c), *Goncalves*, 144 F.3d at 116.

tionary, is "plainly substantive." *Id.* at 128. It was a form of relief present in our immigration laws since 1917, and which in recent years, had been granted to a majority of those who had sought it. *Id.* The court acknowledged that although no one who applied for this discretionary relief was guaranteed to receive it, the right to at least apply was a valuable one. *Id.* at 125, 129–130. Its elimination for certain classes of aliens therefore "clearly raise[d] retroactivity concerns" and triggered the strong presumption against retroactivity recently reaffirmed by the Supreme Court in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) and *Hughes Aircraft v. United States*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997); *Goncalves*, 144 F.3d at 128.[7]

■ Under the rule of *Landgraf* and *Hughes*, a statute should be presumed not to attach a "new disability" or "new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 246, 114 S.Ct. 1483. That presumption can only be overcome by a "plain statement" from Congress that it intends the statute to operate retroactively. *Goncalves*, 144 F.3d at 127. The plainness of the statutory language is determined by reference to the text of the statute and the legislative history. *See id.* The First Circuit found that not only did Congress fail to make such a plain statement—not providing for retroactive application for § 440(d), when it did so with regard to two of AEDPA's other immigration provisions—it explicitly rejected a version of the bill that would have made § 440(d) retroactive. *Id.* at 128–133. AEDPA § 440(d) was thus unlike the many immigration statutes that contain explicitly retroactive provisions. *See, e.g., Barreiro v. INS*, 989 F.2d 62, 64 (1st Cir. 1993) (finding a clear Congressional intent to make an earlier restriction on § 212(c) relief operate retroactively). Congress did not intend, the First Circuit concluded, for AEDPA's restrictions on § 212(c) relief to apply to "persons in Goncalves' position," namely, aliens deportable by reason of having committed crimes of moral turpitude whose § 212(c) applications were already pending when the statute was enacted. *Goncalves*, 144 F.3d at 134.

### 2. The Applicability of Goncalves to Wallace

If Wallace was in "Goncalves' position," that would be the end of the matter. In one important respect, however, he was not: Wallace's application for § 212(c) relief was not already pending on the date of AEDPA's enactment.[8] I must now turn, therefore, to the question of whether the holding of *Goncalves* or the Supreme Court precedent underlying it require the Respondents to hear Wallace's application for humanitarian relief from deportation.

The *Goncalves* court was confronted with the case of a permanent resident whose application for humanitarian relief under

**7.** The First Circuit's recognition that the ability to apply for, if not to receive, § 212(c) relief was a valuable, substantive right forecloses the Respondents' reliance here on its contrary *dicta* in *Kolster*, 101 F.3d at 789. The First Circuit was clearly aware of the tension between its holding in *Goncalves* and its earlier statements in *Kolster* that the availability of discretionary § 212(c) relief did not create substantive rights, *Kolster*, 101 F.3d at 789; in the very paragraph in *Goncalves* in which it recognized the substance and value of the right to apply for relief, it added a footnote that expressly distinguished *Kolster*. *See Goncalves*, 144 F.3d at 128 n. 21. *Kolster*, the First Circuit explained, involved a different section of AEDPA, § 440(a), which stripped the courts of appeals of jurisdiction to hear appeals by aliens deportable by reason of having committed an aggravated felony. Under the Supreme Court's holding in *Landgraf*, the presumption against retroactivity did not apply to this jurisdictional change. The issues raised by § 440(d)'s complete elimination of relief, however, were quite distinct. *See Goncalves*, 144 F.3d at 128 n. 21. Even without the First Circuit's express rejection of *Kolster* as inapposite to the situation before me, as a District Court Judge I am bound to follow the First Circuit's more recent holding: that the right to apply for discretionary humanitarian relief is, indeed, substantive.

**8.** There is another distinction between Wallace and Goncalves; Goncalves was deportable by reason of having committed crimes of moral turpitude, while Wallace is deportable as an alien convicted of a drug crime. For the purposes of the retroactivity analysis here, however, that is a distinction without a difference. Both categories of aliens were barred from seeking § 212(c) relief by the same statutory provision, AEDPA § 440(d).

§ 212(c) had already been pending for a year and a half when AEDPA was enacted. The narrowest reading of its holding, therefore, is that AEDPA § 440(d) cannot be applied to those whose § 212(c) applications had already been filed and were pending as of April 24, 1996. The question before me is whether the presumption against retroactivity bars applying § 440(d) to individuals in a different position—(1) those who had plead guilty to a deportable offense before April 24, 1996, (2) those whose deportation proceedings were pending, or (3) those deportable on the basis of criminal offenses committed prior to that date.

It is important to note at the outset that *Goncalves* did not purport to create a new rule of law concerning the retroactivity of statutes in general or immigration laws in particular. Instead, it set out to apply the presumption against retroactivity "deeply rooted in our jurisprudence ... and centuries older than our Republic," "guided [throughout] by the Supreme Court's retroactivity jurisprudence." *Goncalves*, 144 F.3d at 127 (citing *Landgraf*, 511 U.S. at 265, 114 S.Ct. 1483). Notwithstanding the Respondents' invocation of judicial "hyperbole," *see Doherty v. Thornburgh*, 750 F.Supp. 131, 135 (S.D.N.Y.1990), asserting that Congress has nearly unfettered power to admit, exclude, or deport aliens, the analysis of immigration statutes must take place within that jurisprudence. The power to admit, exclude, or deport, however substantial, is not without rules and limits.

In rehearsing its long tradition of applying the presumption against retroactivity, the *Landgraf* Court quoted with approval Justice Harlan's opinion for the Court in *Chew Heong v. United States*, 112 U.S. 536, 5 S.Ct. 255, 28 L.Ed. 770 (1884). The Chinese Restriction Act of 1882 barred the reentry of Chinese laborers who had not obtained a reentry certificate prior to their departure from this country. The petitioner, however, had left this country prior to the Act, before a reentry certificate was required. The Court refused to apply the law retroactively to bar the petitioner's reentry. Harlan, the *Landgraf* Court recounted:

invoked the "uniformly" accepted rule against "giv[ing] to statutes a retrospective operation, whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature." *Landgraf*, 511 U.S. at 271–72, 114 S.Ct. 1483 (quoting *Chew Heong*, 112 U.S. at 559, 5 S.Ct. 255) (alteration and quotation marks in original); *see also, United States v. Jung Ah Lung*, 124 U.S. 621, 634, 8 S.Ct. 663, 31 L.Ed. 591 (1888) (applying the presumption against retroactivity with regard to an immigrant laborer's "previously vested right to return"). It is in this context that *Goncalves'* implications for Wallace must be understood.

The issues raised here are thus distinct from those raised by many prior challenges to the retroactivity of immigration statutes. Congress can, and often does, attach new and drastic immigration consequences to conduct that occurred long in the past. *See, e.g.,* IIRIRA § 309(c)(4)(G) (precluding appeal in the case of an alien who has committed two crimes of moral turpitude, "without regard to their date of commission"); IIRIRA § 321 (amending INA § 101(a)(43), 8 U.S.C. § 1101(a)(43) so as to dramatically expand the definition of "aggravated felony" "regardless of when the conviction occurred"); *Lehmann v. United States*, 353 U.S. 685, 690, 77 S.Ct. 1022, 1 L.Ed.2d 1122 (1957) (finding it "indisputable" that Congress intended to legislate retrospectively when it provided for deportation of those who committed specified crimes "at any time after entry"); *Barreiro v. INS*, 989 F.2d at 64 (finding that Congress clearly intended to make 1990 amendments restricting § 212(c) relief retroactive, covering "convictions before, on, or after" the date of enactment); *Matter of A A–*, 20 I. & N. Dec. 492, 495–98 (BIA 1992) (same); *but see* AEDPA § 440(f)(limiting AEDPA's expansion of the definition of "aggravated felony" to "convictions entered on or after" the date of enactment). Such retroactive immigration laws—where Congress is clear about its intent, or where statutory issues are not raised—have withstood frequent constitutional challenges based on the *ex post facto* or due process clauses. *See, e.g., Marcello v. Bonds*, 349 U.S. 302, 313, 75 S.Ct. 757, 99

L.Ed. 1107 (1955); *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954); *Harisiades v. Shaughnessy,* 342 U.S. 580, 587–591, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

### 3. The Meaning of Retroactivity Under Landgraf, Hughes, and Goncalves

The presumption against retroactivity has roots as far back as the English common law and is reflected in our Constitution. *Landgraf,* 511 U.S. at 265–266, 114 S.Ct. 1483. It serves to foster a "free, dynamic society" and "restrain... arbitrary and potentially vindictive legislation." *Id.* at 266–67, 114 S.Ct. 1483.

■ It is simpler to recognize this presumption, however, than to apply it. This is not a simple or mechanical task, but one that requires the exercise of judgment and instinct. *Id.* at 270, 114 S.Ct. 1483. The analysis is a "functional" one. *Id.* at 269, 114 S.Ct. 1483. A court should consider "the nature and extent of the change in the law and the degree of connection between the operation of the rule and the relevant past event," always keeping in mind the governing principles of "fair notice, reasonable reliance, and settled expectations." *Id.* at 270, 114 S.Ct. 1483. If a statute would "impair rights a party possessed when he acted, increase a party's liability for past conduct ...." or "attach a new disability in respect to transactions ... already past," it would meet this test, and it should be presumed not to apply to events before its enactment. *Id.* at 269, 280, 114 S.Ct. 1483.

This analytical framework clarifies the application of *Goncalves* to this case. Clearly, to bar a permanent resident alien from applying for humanitarian relief under § 212(c) not only impairs a substantive right, *Goncalves,* 144 F.3d at 128, it also imposes additional burdens or consequences for events commenced before the time of its enactment, events as to which the permanent resident alien had settled expectations. *Id.* at 130.

The question then becomes, which "past events" are at issue here. Some have occurred prior to the passage of AEDPA, some after.

Four possibilities present themselves: a) the plea that made Wallace deportable; b) Wallace's initial formal request for § 212(c) relief; c) the initiation of Wallace's deportation case; and d) the criminal conduct underlying the conviction. I will address each in turn.

### a. The Date of the Plea That Gives Rise to Deportability

Until a criminal defendant is found guilty or pleads, the defendant is presumed innocent of all charged offenses; surely no dire immigration consequences can attach at that point. Waiving the right to trial and pleading guilty is a momentous decision. Every criminal defendant must consider a range of factors before making such a choice. Chief among them are the penalties, both civil and penal, that she risks if she goes to trial and is convicted, compared to those she is sure to face as a result of a plea bargain. One of the most important consequence she might face is the risk of deportation.

By the time of Wallace's conviction, it was widely recognized as a violation of an attorney's professional duty to her client not to advise her of the immigration consequences of a plea or conviction. *See Mojica v. Reno,* 970 F.Supp. 130, 177 (E.D.N.Y.1997) (listing bar and defender associations that required their members to advise clients of the deportation consequences of a plea). In some states, failure to do so was considered ineffective assistance of counsel, *see, e.g., People v. Soriano,* 194 Cal.App.3d 1470, 240 Cal. Rptr. 328, 336 (Cal.App.1987); *People v. Pozo,* 746 P.2d 523, 529 (Colo.1987); a fact of which legal publications warned criminal attorneys. *See, e.g.,* Daniel M. Kowalski and Daniel C. Horne, *Defending the Non-citizen,* 24 Colo. Law 2177, 2177–78 (1995); Mary L. Sfasciotti, *Representing Aliens in Criminal Cases—Recent Amendments to the Immigration and Naturalization Act,* 79 Ill.B.J. 78, 78 (Feb.1991) (carrying the headline: "Attorneys Beware—Illinois courts permit alien defendants to vacate convictions for ineffective assistance of counsel because their lawyers failed to advise them about the collateral effects of convictions on immigration status.").

In at least thirteen states, including Massachusetts, the presiding judge must inquire

during a plea colloquy whether an alien defendant was, in fact, informed of the plea's immigration consequences. *Mojica*, 970 F.Supp. at 177 (listing statutes from California, Connecticut, Massachusetts, New York, Ohio, Oregon, Texas, and Washington). If the judge failed to do so, the plea could be set aside. *See* Mass. Gen. L. ch. 278, § 29D. *See also United States v. Del Rosario*, 902 F.2d 55, 61 (D.C.Cir.1990) (Mikva, J., concurring) (proposing Fed.R.Crim.P. 11 be amended to require that a defendant be informed of deportation consequences in a federal plea colloquy); *United States v. Briscoe*, 432 F.2d 1351, 1353 (D.C.Cir.1970) ("Under appropriate circumstances the fact that a defendant has been misled as to deportability may render his guilty plea subject to attack.").

In the years immediately preceding the passage of AEDPA, moreover, any competent advice an alien defendant received about the immigration consequences of a guilty plea would have included a discussion of the possibility of § 212(c) relief and what is required to be eligible to apply. For a client charged with a narcotics offense, an attorney should have known that a § 212(c) waiver was the only relief available. Sfasciotti, *Representing Aliens*, 79 Ill.B.J. at 78; Tapia–Ruano, *Recent Developments*, 422 PLI/Lit at 995. Criminal attorneys were instructed by their own practice guides that a § 212(c) waiver "is probably the most common form of relief available, and also certainly the easiest to obtain . . . ." Sultan, *Immigration Consequences*, 30–JUN Ariz. Att'y at 31. Law reviews and government publications reported that a large percentage, or even a majority, of § 212(c) applications were granted. *See Goncalves*, 144 F.3d at 128; *Mojica*, 970 F.Supp. at 178 (citing U.S. Dept. of Justice EOIR Statistical Sheet 1, Jan. 19, 1995); Anjali Parekh Prakash, *Changing the Rules: Arguing Against Retroactive Application of Deportation Statutes*, 72 N.Y.U.L.Rev. 1420, 1456 (1997). Criminal attorneys may well have passed on to their clients such confident assessments of the odds of obtaining § 212(c) relief.

For the minor or first time offenders who were the best candidates for § 212(c) relief, moreover, the immigration consequences of a plea would often have been even more severe than the penal ones. Even Wallace, who was facing a drug charge, was sentenced to only three years in prison by the state courts but now faces the immigration sanction of permanent exile from this country, where he has lived for ten years. For many other offenders, the disparity in consequences was far greater.[9] As many courts have noted, "[t]he possibility of being deported can be—and frequently is—the most important factor in a criminal defendant's decision how to plead." *Del Rosario*, 902 F.2d at 61 (Mikva, J., concurring); *accord Mojica*, 970 F.Supp. at 175 (listing cases). Given that over 92% of aliens convicted in United States district courts in 1994 pleaded guilty, *Mojica*, 970 F.Supp. at 175, the importance of aliens' understanding of the immigration laws at the time of their pleas—including the possibility of applying for and obtaining § 212(c) relief—can hardly be overestimated. *See Sandoval v. Reno*, 1997 WL 839465, *11 (E.D.Pa.) ("an alien's decision, prior to the AEDPA's enactment, to plead guilty to a particular crime may have hinged entirely upon his knowledge that he would eligible for § 212(c) relief . . . .").

At the moment of indictment, then, a noncitizen criminal defendant would most likely have been informed of and had good reason to consider the immigration consequences of a guilty plea. If the attorney had fulfilled her obligations, a defendant such as Wallace should have factored into those considerations his eligibility for § 212(c) relief and that a majority of those who sought it had succeeded.

There is thus a direct and meaningful connection between the operation of AEDPA's new rule barring § 212(c) relief to many alien criminal offenders and a past event— those same offenders' voluntary decision to waive their right to a trial and plead guilty. AEDPA's bar to § 212(c) relief attached new legal consequences to the guilty pleas, after the fact. To apply those consequences now

---

9. Under the leading BIA case *Matter of Ozkok*, even a sentence of probation, restitution, or community service—indeed, the suspension of a driver's license—may be considered a conviction for the purposes of immigration law. *Matter of Ozkok*, 19 I. & N. Dec. 546, 551 (BIA 1988).

would offend principles of fair notice and respect for reasonable reliance and settled expectations. *See Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483. The presumption against retroactivity therefore applies to bar the application of § 440(d) to aliens whose deportability rests on guilty pleas, entered prior to April 24, 1996. Just as the First Circuit held that the Congress may not place additional burdens on Goncalves's completed act of applying for § 212(c) relief, so too it may not place additional burdens on Wallace's completed act—to waive his trial rights and plead guilty.

■ This analysis is not affected by the fact that the underlying conduct was by definition unlawful at the time it was committed. As the Supreme Court has held, a "legal change that would have an impact on private parties' planning" implicates the presumption against retroactivity, even if the change does nothing more than attach additional civil liability to conduct that was already sanctioned as "morally reprehensible or illegal." *Landgraf,* 511 U.S. at 282–83 & n. 35, 114 S.Ct. 1483 (new law adding compensatory damages for unlawful employment discrimination could not be applied retroactively); *Hughes,* 520 U.S. at—, 117 S.Ct. at 1876–77 (precluding retroactive application of a law eliminating a defense to a civil suit for filing a false claim with the U.S. government—an act which had been unlawful since 1863).

Deportation, in the words of the Supreme Court, is "at times equivalent of banishment or exile ...." *Costello v. INS,* 376 U.S. 120, 131, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964); *Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948). Perhaps nowhere outside of the criminal law are the consequences for the individual so serious. *See Lehmann,* 353 U.S. at 691, 77 S.Ct. 1022 (Black, J., concurring) (deportation is "punishment of the most drastic kind"); *Lok v. INS,* 548 F.2d 37, 39 (2d Cir.1977) ("Deportation is a sanction which in severity surpasses all but the most Draconian criminal penalties."). It may deprive the alien of "all that makes life worth living," *Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938(1922), including the "right to stay and live and work in this land of freedom," *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), or the possibility of living with her immediate family, "a right that ranks high among the interests of the individual." *Landon v. Plasencia,* 459 U.S. 21, 34, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).

Recognizing the tremendous personal stakes involved, the Supreme Court has admonished that "[i]n this area of the law ... we do well to eschew technicalities and fictions and instead deal with realities." *Costello,* 376 U.S. at 131, 84 S.Ct. 580. As discussed above, the reality is that it is during the underlying criminal proceedings that the immigrant is most likely to first have learned of and considered the crucial connection between his criminal offense and his future in this country. It is at that point that he is likely to have relied on the then-existing immigration laws in making the decision to plead guilty, a decision made not just by Wallace but by over 92% of non-citizen criminal offenders.

A realistic rather than technical analysis of retroactivity strongly suggest that to attach additional consequences to this decision by barring all opportunity to present one's equitable plea for relief from deportation would violate traditional notions of fair notice and upset settled expectations. In contrast, to link retroactivity to a particular moment in immigration proceedings as the INS request—whether the issuance of the OSC, the filing of the OSC with the Immigration Court, or the application for § 212(c) relief—would be to focus on just such a technicality.

#### b. *The Date of the Immigrant's Application for § 212(c) Relief*

The Respondent urges me instead to confine the holding of *Goncalves* to its facts and hold that § 440(d) would only be impermissibly retroactive were it to apply to applications for § 212(c) relief already filed as of April 24, 1996.

This narrow application of *Goncalves* does not accord with the language of *Goncalves* itself; the opinion refers at times to "pending cases" and "pending applications" almost in-

terchangeably.[10] More fundamentally, a focus on the date of application would be inconsistent with the *Goncalves* court's underlying reasoning. The date on which a permanent resident filed for § 212(c) relief was usually determined by a random set of facts outside the resident's control.[11] An alien in deportation proceedings had no opportunity even to express an intent to apply for § 212(c) relief until the first hearing before an Immigration Judge. 8 C.F.R. § 212.3(e)(1) ("An application for the exercise of discretion under section § 212(c) may be ... submitted in proceedings *before an Immigration Judge.*") (emphasis added). As a member of the BIA has pointed out, "eligible legal residents requiring a waiver have no control over when proceedings are commenced or how quickly and in what order hearings and appeals are set or adjudicated." *See Matter of Soriano*, Int. Dec. 3289 (Op. of Rosenberg). Indeed, not only is the date of the initial hearing not in the immigrant's control, the initiation of formal proceedings by the filing of the OSC with the Immigration Court is entirely within the control of the INS, her adversary in the proceedings. 8 C.F.R. § 3, 14(a).

Here, it took the INS three months to complete the clerical task of filing the Order to Show Cause with the Immigration Court. In the interim, on April 24, 1996, AEDPA had been passed. Then Wallace faced an additional six month delay while the Immigration Court found an opportunity, in its crowded docket, to hold an initial hearing in his case. Although Wallace expressed his intent to apply for § 212(c) relief immediately at his first hearing, it is unclear when his application was formally filed. *See* 8 C.F.R. § 212.3(e) (not specifying when during the Immigration Court proceedings the I–191 application form itself had to be filed).

Defining retroactivity as only encompassing pending petitions consequently ignores the Supreme Court's directive that retroactivity is a "functional" concept, not an abstract, technical one. *Hughes*, 117 S.Ct. at 1876; *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483. As part of this functional analysis, retroactivity is to be judged partly by assessing the "connection between the operation of the new rule and [the] relevant past event." *Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483. There is little connection between a law that bars alien criminal offenders from applying for discretionary relief and random acts of administrative scheduling.

Nor would confining *Goncalves* to pending applications make sense in light of the central theme of the Court's retroactivity jurisprudence: that a statute is retroactive if it imposes additional burdens for *past conduct*. *See, e.g., Hughes*, 520 U.S. ——, 117 S.Ct. at 1876–78; *Landgraf*, 511 U.S. at 269 n. 23, 114 S.Ct. 1483 (citing *Miller v. Florida*,

---

10. *See, e.g., Goncalves*, 144 F.3d at 112 ("[w]hile Goncalves' application was still pending, Congress enacted" AEDPA), 114 ("At the time the deportation proceedings against him commenced, Goncalves was eligible to apply ... for a discretionary waiver of deportation."), *id.* (referring to "pending applications"), 126 (referring in successive sentences to "pending applications" and "pending cases"), 129 (same), 131 ("pending applications"), 131–32 (discussing significance of Congress' rejection of versions of § 440(d) that would have applied it to "pending cases").

11. Although the regulations technically allowed applications for a § 212(c) waiver to be filed with the INS District Director at any time, 8 C.F.R. § 212.3(b), in 1994, the INS took the position that this regulation "did not allow aliens to request § 212(c) relief as a form of relief from deportation prior to the actual institution of deportation proceedings." 71 *Interpreter Releases* 949 (July 18, 1994). Although there is some debate over when a deportation proceeding "commences," INS regulations state that "proceedings before an Immigration Judge commence when a charging document [such as an Order to Show Cause] is filed with the Immigration Court by the Service," 8 C.F.R. § 3.14(a), not the issuance of the OSC, or its service. As discussed below, the INS has control over when the filing is complete. The alien can apply for relief only after this act is taken by INS. *See also Vargas v. Reno*, 966 F.Supp. 1537, 1546 (S.D.Ca. 1997) (reviewing 8 C.F.R. § 212.3 and finding no place in which it states that aliens can apply for relief at any time they are not in deportation proceedings).

The argument that had Wallace applied for section 212(c) at the time when he was first served with the OSC, March 18, 1996, he would have been within the scope of the *Goncalves* decision is thus baseless. As the service of OSC does not appear to "commence" the deportation proceedings, Wallace still had to wait until the OSC was filed before his application for relief could be submitted.

482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) ("A law is retrospective if it 'changes the legal consequences of *acts* completed before its effective date'") (quoting *Weaver v. Graham,* 450 U.S. 24, 31, 101 S.Ct. 960, 67 L.Ed.2d 17(1981)); *Union Pacific R. Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179 (1913) (retroactive statute gives "a quality or effect to *acts or conduct* which they did not have or did not contemplate when they were performed") (emphases added)).

A successful applicant for § 212(c) relief normally had to demonstrate strong family ties in this country, the hardship that would arise from deportation, and her contributions to her community and to the nation, *see Matter of Marin,* 16 I. & N. Dec. at 584–85. The complete foreclosure of that relief burdens the resident, her family, and her community. None of their conduct is implicated by the time the first hearing at which the resident may apply for relief is held. The only conduct that triggers this event is the conduct of the INS and the Immigration Court.[12]

Because the date of application may depend, as in this case, on random administrative factors beyond the applicant's control, to limit the retroactivity analysis to pending applications would also run afoul of the "elementary considerations of fairness" that animate the presumption against retroactivity.

*Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483. It would be equivalent to judging the timeliness of a plaintiff's complaint not according to the date plaintiff filed it, but by the date of the defendant's answer or of the first conference scheduled by the court.

Confronted with a similar question involving appeals against erroneous determinations by the Secretary of Health and Human Services, the First Circuit rejected a retroactivity analysis that pivoted on the date on which a claim was "finally adjudicated." "The Secretary's interpretation," the court held,

> would lead to an unacceptable disparity between claims based on the luck of particular applicant in pushing her claim through the sometimes frustratingly slow administrative and judicial process.

*Dion v. Secretary of Health and Human Servs.,* 823 F.2d 669, 672 (1st Cir.1987).[13] Similarly, I refuse to link the retroactive analysis in this case to the immigrant's date of application for relief, when this is so much within the control of the INS.

## C. The Application of Goncalves to Immigration Cases Pending as of AEDPA's enactment

Similar consideration of fortuity and fairness govern the analysis of whether *Goncalves'* holding should be understood as ap-

---

**12.** The argument for the "moment of application" as a trigger point might be different if, in the very act of applying for § 212(c) relief, the alien made a meaningful strategic choice, waiving a defense to deportability, for example, in exchange for the opportunity to apply for discretionary relief. *See Landgraf,* 511 U.S. at 282, 114 S.Ct. 1483 (retroactivity is implicated by legal changes that "have an impact on private parties' planning"). In that case, the moment of the formal application would be significant. The alien would have a reasonable reliance interest in and a settled expectation of the continued availability of relief. *See id.* at 270, 114 S.Ct. 1483 (identifying reliance and settled expectation as considerations that should guide the assessment of retroactivity). Yet in most § 212(c) cases, the fact of deportability is incontestable. *See Kolster,* 101 F.3d at 789 (describing deportability as "a largely mechanical determination based on facts which may often be objectively ascertained"); Tarik H. Sultan, *Immigration Consequences of Criminal Convictions,* 30–JUN Ariz. Att'y 15 (1994) (remarking that, once in

deportation, "[u]sually the fact of a conviction simply can't be helped"). In the case of an alien convicted, like Wallace, of a drug offense, there was no alternative but § 212(c) relief. *See, e.g.,* Carlina Tapia–Ruano, *Recent Developments in 212(c) Cases,* 422 PLI/Lit 991, 995 (1991). The only question then is not whether an application should be made for section 212(c) relief, but *when;* a question determined by the INS' and the Immigration Court's actions, not petitioner's.

**13.** This analysis applies even more strongly to Respondent's suggestion that AEDPA would not operate retroactively here because the INS did not manage to file the OSC with the Immigration Court for three months, and that therefore, under applicable regulations, Wallace's was not technically "in deportation proceedings" according to INS regulations on the date that AEDPA was enacted. *See* 8 C.F.R. § 3.14 ("proceedings before an Immigration Judge commence ... when a charging document is filed with the Immigration Court *by the Service* [i.e., the INS]." (emphasis added)).

plying only to immigration cases pending on the date of AEDPA's enactment. In most instances, an immigrant had as little control over the initiation of deportation proceedings as over the scheduling of her first hearing before an Immigration Judge. Wallace was convicted in February of 1996 and served with an OSC just over a month later. For many others, however, the connection between conviction and deportation was neither so immediate nor so direct. Years might elapse between conviction and deportation, with the deportation proceedings not triggered by the conviction itself but by a lawful resident's random contacts with the INS.[14]

As with the date on which a § 212(c) application was filed, the date on which a deportation case becomes a pending case is not a relevant past event within the *Landgraf* framework. That date has only a tenuous connection to the conduct that is in fact being burdened with additional liability by AEDPA, that is, to the criminal conviction itself. Considerations of both logic and fairness suggest that it is not the proper focus of the retroactivity analysis.

This conclusion is bolstered by the Supreme Court's holding in *Hughes Aircraft v. United States,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135. In 1982 and 1984, Hughes Aircraft submitted allegedly false claims for payment to the United States. *Id.* ──, 117 S.Ct. at 1876. In 1986, a suit was commenced under the False Claims Act ("FCA"), which was first enacted in 1983 but was amended between the time of the submission of the claims and the institution of the suit two years later so as to eliminate a defense to liability. *Id.* ── ──, 117 S.Ct. at 1876–77. This amendment, the Court held,

triggered the presumption against retroactivity and therefore could not apply to the case in the absence of a clear Congressional statement to the contrary. *Id.* at ── – ──, 117 S.Ct. at 1878–79.

The conduct "relevant" to the retroactivity analysis was either Hughes' submission of the allegedly false claims or its disclosure of the claims to the government in a subsequent administrative audit. *Id.* at──, 117 S.Ct. at 1878. Both events occurred prior to the 1986 amendment removing any defense to suit based on that disclosure. The fact that the suit was not brought until after that amendment was irrelevant. What mattered to the Court was the date of the underlying conduct, not the formal filing of the suit to which it gave rise—in this case that is Wallace's guilty plea.

### III. *CONCLUSION*

In February 1996, Wallace pleaded guilty to a drug offense. At that time, his plea rendered him liable to deportation from this country, but he still had the opportunity to present the equities of his case to an Immigration Judge and seek discretionary permission to remain. Two months later, AEDPA § 440(d) was passed, eliminating the right of aliens in Wallace's situation to even present a case for discretionary relief.

Applying the rule of *Landgraf* and *Hughes,* clearly made applicable to AEDPA § 440(d) by *Goncalves,* I conclude that it would violate the presumption against retroactivity to apply that statute's bar to a humanitarian relief from deportation to this case.[15]

**14.** In approaching the "pure issue of law" of the retroactive effect of § 440(d), *see Goncalves,* 144 F.3d at 113, I take judicial notice of the potential relationship in practice between conviction and deportation revealed in other cases. In *Soriano,* the lapse between conviction and deportation proceedings was eleven months. *Soriano,* Int, Dec. 3289. In *Mojica v. Reno,* it was seven years. The petitioner in that case had been convicted in 1989. He renewed his green card without problems in 1994, and when he applied for U.S. citizenship the following year, the application was processed and a naturalization interview was set for March of 1996. It was only upon his return from a brief visit to his relatives abroad in January 1996 that he was detained by

the INS on the grounds of his conviction seven years earlier. Even then, he was placed in deportation proceedings that the INS subsequently terminated. An OSC was not issued until May of 1996. *Mojica,* 970 F.Supp. at 140–41. In *Cruz–Taveras v. McElroy,* 1996 WL 455012 (S.D.N.Y.) the lapse was again seven years, with deportation proceedings triggered by the immigrant's return from a brief visit to his father abroad. *Id.* At *1.

**15.** As noted above, IIRIRA has now eliminated altogether the form of relief Wallace is seeking here. Unlike AEDPA § 440(d), however, that elimination of relief carried an explicit effective date: it applied to all those whose deportation

Therefore, I do not need to reach the question of whether the retroactivity analysis should extend as far back as the date of the criminal conduct on which that conviction was based. Nor do I reach Wallace's constitutional challenges to the BIA's application of § 440(d) to permanent resident aliens in deportation proceedings, but not to those in exclusion proceedings.[16]

As I stated at the outset, Wallace has not come before this Court to ask not to be deported. That decision lies within the discretion of the Respondents. All Wallace asks is the opportunity to be heard. He seeks to come before an Immigration Judge and present the humanitarian and social factors that might make him deserving of discretionary relief. Because Wallace has been denied this opportunity, there is as of yet no record of what those factors may be. I neither have nor express any opinion on whether Wallace's ties to this country and contributions to his community outweigh the fact of his drug conviction. I merely conclude that under the law as it existed at the time he admitted to and was convicted for that offense, he is entitled to argue his case

before an independent decision maker before being expelled from the country that has become his home.

Wallace's petition for habeas corpus is therefore **GRANTED**. This case is **REMANDED** to the Board of Immigration Appeals for a discretionary consideration of the merits of his application for relief under INA § 212(c), 8 U.S.C. § 1182(c) as it stood on the date of the February 1996 conviction that rendered Wallace deportable.

**SO ORDERED.**

---

proceedings commenced after April 1, 1997. *Goncalves*, 144 F.3d at 116.

16. Wallace challenges AEDPA's bar to section 212(c) relief on the constitutional grounds that it precludes relief for aliens in deportation proceedings (resident aliens placed in deportation proceedings without having left the country), but not for those in exclusion proceedings (resident aliens stopped at the border on their return from abroad). *See Almon v. Reno*, 13 F.Supp.2d 143, 146 (D.Mass.) (finding that applicant's equal protection rights were violated by BIA's interpretation of AEDPA to permit relief for aliens in exclusion, but not deportation proceedings); *Jurado–Gutierrez v. Greene*, 977 F.Supp. 1089, 1091 (same); *Matter of Fuentes–Compos*, Int. Dec. No. 3318 (BIA May 14, 19997) (holding that applicant for admission in exclusion proceedings who is inadmissible on the basis of a controlled substance offense is statutorily eligible for a waiver on inadmissibility under INA section 212(c), even as amended by AEDPA section 404(d)).

Resident aliens in deportation proceedings and exclusion proceedings have a constitutional right to due process. *See e.g., Landon v. Plasencia*, 459 U.S. 21, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). Numerous courts have recognized that it would be a violation of equal protection to refuse to hear petitions for discretionary relief from permanent resident aliens in deportation proceedings, but to consider such petitions from

immigrants charged with the same offense and with the same ties to this country, merely because the latter had taken a brief trip abroad and been placed in exclusion proceedings upon their return. *See e.g., Francis v. INS*, 532 F.2d 268, 269 (2nd Cir.1976); *Almon*, 13 F.Supp.2d at 144 (stating that this rule has been universally accepted by the Courts of Appeals). AEDPA section 404(d), as interpreted and applied by the BIA, appears to do must that. *See e.g., Almon*, at 146; *Musto v. Perryman*, 1998 WL 242151, *5 (N.D.Ill.); *Cruz v. Reno*, 6 F.Supp.2d 744, 757 (N.D.Ill.); *Vargas v. Reno*, 966 F.Supp. 1537 (S.D.Ca.1997); *Jurado–Gutierrez v. Greene*, 977 F.Supp. 1089 (D.Colo.1997). Furthermore, as another judge in this district has found, it appears as though there is only a small group of individuals who can show a violation of equal protection—those whose deportation proceedings commenced prior to April 1, 1997 (after which IIRIRA's bar of relief for both exclusion and deportation proceedings eliminates this challenge) and whose applications for relief were denied after May 14, 1997 (when the BIA began considering the applications of those in exclusion proceedings). *See Almon*, 13 F.Supp.2d at 144–45; *see also Jurado–Gutierrez*, 977 F.Supp. at 1093–94. Having found that section 404(d) should not apply to Wallace based on a statutory interpretation, however, I need not decide whether Wallace has succeeded with this constitutional claim. *See Goncalves*, 144 F.3d at 134.