**Okomo Nkomo WALLACE,
Petitioner/Plaintiff,**

v.

**Janet RENO, Attorney General, Doris Meissner, Commissioner of the Immigration and Naturalization Service, and Steve Farquharson, District Director, Respondents/Defendants.**

**No. 98–11181–NG.**

United States District Court,
D. Massachusetts.

March 19, 1999.

### MEMORANDUM AND ORDER
### OF REMAND

GERTNER, District Judge.

The petitioner/plaintiff, Ojomo Nkomo Wallace ("Wallace") [1] petitions for a writ of habeas corpus on statutory and constitutional grounds. Wallace seeks to have his case remanded to the Board of Immigration Appeals ("BIA") for a hearing on the merits of his Immigration and Naturalization Act ("INA") § 212(c), 8 U.S.C. § 1182(c), application for discretionary relief.[2] The issue is a critical one. Traditionally, an application under 212(c) was the way that petitioners could defend against deportation. It was the means by which to show more of their humanity—their ties to this country, their contributions to the polity—than the label "alien" otherwise suggested.

The issue was especially critical for this petitioner. There was no question as to Wallace's deportability. At the time he was convicted of possession of marijuana with intent to distribute, the INA provided that an alien convicted of any controlled substance offense, at any time after entry, was deportable. INA § 241(a)(2)(B), 8 U.S.C. § 1227(a)(2)(B) (1996) [formally 8 U.S.C. § 1251] (West Supp.1998). It did not matter how long the alien had been in this country, how aberrant the criminal conduct was in the alien's life, or, with one

1. The petitioner in the instant case is the brother of the petitioner in *Wallace v. Reno,* 24 F.Supp.2d 104 (D.Mass.1998), decided by this court and cited in this opinion.

2. As a threshold matter, the First Circuit in *Goncalves v. Reno,* 144 F.3d 110, 124, 125 (1st Cir.1998), *petition for cert. denied,* —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1998) held that, pursuant to 28 U.S.C. § 2241, district courts still have jurisdiction over habeas petitions raising issues similar to those raised by Wallace. The reasoning applied by the First and other circuits is that absent language affirmatively saying so, the courts presume Congress did not intend to bar federal court's habeas jurisdiction. *See e.g., Henderson v. INS,* 157 F.3d 106, 122 (2nd Cir.1998); *Goncalves,* 144 F.3d at 118–23; *Magana–Pizano v. INS,* 152 F.3d 1213, amended, 159 F.3d 1217 (9th Cir.1998). *But see La Guerre v. Reno,* 164 F.3d 1035 (7th Cir.) (holding that after amendments to INA, district courts do not have habeas review); *Richardson v. Reno,* 1998 WL 850045, —— F.3d —— (11th Cir.1998) (same).

Although *Goncalves* did not specifically address the question of the habeas review of constitutional issues, the First Circuit has subsequently interpreted *Goncalves* as holding that an alien cannot bring "a constitutional challenge to his deportation order by means of petition [to the Court of Appeals], but must instead file a habeas petition in the district court." *Ruckbi v. INS,* 159 F.3d 18, 21 (1st Cir.1998) (citing *Goncalves,* 144 F.3d at 118, 123; *Santos v. INS,* 124 F.3d 64 (1st Cir. 1997)) ("holding that the Court of Appeals was precluded under the transitional rules of the IIRIRA from reviewing final order of deportation where alien had admitted commission of essential elements of crimes set forth in INS as bases for exclusion"). Thus I conclude that this Court has jurisdiction to review Wallace's petition for habeas corpus on both statutory and constitutional grounds. *See also Jurado–Gutierrez v. Greene,* 977 F.Supp. 1089, 1091 (D.Colo.1997) (citing cases where courts found that federal district court jurisdiction remains to hear petitions for alleged substantial constitutional violations) (citations omitted).

exception,[3] how minor the offense was. Wallace's only defense was to seek discretionary relief on the grounds of his long residence here and his ties to this country under § 212(c). His petition, like many others similarly situated, hinged on whether, after the enactment of the Anti–Terrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996) ("AEDPA"), discretionary relief was still available to him at all.

At his deportation hearing, Wallace attempted to apply for § 212(c) discretionary relief from deportation. The Immigration Judge ("IJ") denied his request, finding that § 440(d) of AEDPA rendered him ineligible. Wallace's subsequent appeal to the Board of Immigration Appeals ("BIA") was also denied on the same grounds.

Wallace filed this complaint, contending that even if § 440(d) applies to his case, construing the law to bar § 212(c) relief to aliens in deportation proceedings, but not those in exclusion proceedings, violates the Equal Protection Clause guaranteed by the Fifth Amendment of the United States Constitution.[4]

3. Other than a single offense of possession of 30 grams or less of marijuana for personal use. *Id.*

4. Wallace argued that § 440(d) cannot be applied retroactively when his criminal *conduct* occurred *prior* to AEDPA's enactment. The First Circuit in *Goncalves*, 144 F.3d 110 at 126, held that § 440(d) did not apply retroactively when the petitioner's application for § 212(c) was pending, and, indeed, on appeal to the BIA, at the time the AEDPA was enacted. Additionally, in *Wallace v. Reno*, 24 F.Supp.2d 104, 112 (D.Mass.1998) this Court held that 440(d) did not apply retroactively when (1) the petitioner pled guilty prior to AEDPA's passage; (2) he was eligible for relief at the time of the plea so as to create a reliance interest in being able to apply for this protection; (3) the Order to Show Cause was issued prior to the AEDPA, and (4) the only reason petitioner was not similarly situated to Goncalves was INS's delay in setting up the hearing. *See also Almonte v. Reno*, 27 F.Supp.2d 106 (D.Mass.1998) (extending *Goncalves* where petitioner gave INS clear notice

For the reasons stated below, I agree with the petitioner's Equal Protection Argument. Therefore, Wallace's Petition for Writ for Habeas Corpus is **GRANTED.**

## I. *FACTS*

Wallace is a native and citizen of Jamaica. He entered the United States as an immigrant on May 10, 1988. He was fourteen years old. He has lived here—apparently without a problem—for eight years.

On September 19, 1996, Wallace was convicted in the Providence Superior Court, Providence, Rhode Island, of possession of marijuana with intent to distribute.[5] Although he was sentenced to twenty years imprisonment, he was obliged to serve only three years, with seventeen years of the sentence suspended.

As a result of this conviction, for what immigration law characterizes as an "aggravated felony," Wallace was subject to deportation. 8 U.S.C. §§ 1101(a)(43), 1227(a)(2)(A)(iii), 1227(a)(2)(B)(i). Accordingly, the INS issued an administrative Order to Show Cause ("OSC") on October 15, 1996; his deportation proceedings began on April 17, 1997. At his final hear-

of intent to apply for relief prior to AEDPA enactment); *Ranglin v. Reno*, 27 F.Supp.2d 262 (D.Mass.1998) (extending *Goncalves* to cases where petitioner was already in deportation proceedings at time of AEDPA enactment).

Unlike these cases, the petitioner here did not plead guilty until September 19, 1996—five months *after* the AEDPA was enacted—and the deportation proceedings did not commence until October 15, 1996—six months *after* AEDPA was enacted. Thus, even under the broadest readings of *Goncalves*, this case does not fit.

5. The petitioner and respondent memorandum each provide a different date for Wallace's conviction—Wallace's petition for writ of habeas corpus refers to November 19, 1996, and the Respondents' opposition uses September 19, 1996. Since INS issued the Order for Cause on October 15, 1996—arguably *after* his conviction—the November 19, 1996, date could not be correct. Therefore, I have adopted September 19, 1996, for the purposes of this decision.

ing, on August 19, 1997, Wallace conceded deportability and immediately filed for discretionary relief from deportation under INA § 212(c). The IJ denied his request because § 440(d) of AEDPA, enacted the year before, on April 24, 1996, rendered Wallace ineligible for § 212(c) relief. Accordingly, the IJ ordered Wallace deported to Jamaica.

On September 4, 1997, Wallace filed a timely appeal of the IJ's decision to the BIA. The BIA dismissed his appeal on May 15, 1998, affirming the IJ's decision. Wallace filed the instant action on June 16, 1998. Wallace is detained pending execution of the deportation order.

## II. DISCUSSION

### A. Statutory History

■ Until the recent amendments to the INA, a request for the humanitarian relief Wallace seeks was made by applying for a waiver of "excludability" under INA § 212(c), 8 U.S.C. § 1182(c). INA § 212(c) provided that:

Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years may be admitted in the discretion of the Attorney General .... The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years. Id.

Although the language of the text provides only for relief to resident aliens facing "exclusion," it has long applied with equal force to lawful residents facing deportation. See Francis v. INS, 532 F.2d 268, 273 (2d Cir.1976); Matter of Silva, Int. Dec. 2532 (BIA 1976) (adopting Fran-

cis nationwide); Campos v. INS, 961 F.2d 309, 313 (1st Cir.1992) (adopting Francis and Silva in the First Circuit). Had the law not changed in 1996, § 212(c) would have applied to Wallace in his deportation proceedings.

Under the former § 212(c), an IJ's decision whether to grant the relief was a discretionary one, based on a balancing of equities—including the alien's length of residence here, especially if it began at a young age; her family ties; the hardship to the alien if deported; proof of rehabilitation; work history; military service to this country; ownership of a business or property here; and any other evidence of her good character and value to the community and the nation. See Matter of Marin, 16 I. & N. Dec. 581, 584–85 (BIA 1978). Apart from his long residence here, the record does not reflect what Wallace's equities are because he was never allowed to apply for § 212(c) relief.

What is clear is that nothing about Wallace's conviction and imprisonment would have automatically disqualified him. Even an alien convicted of an "aggravated felony," such as drug trafficking, could apply for § 212(c) relief unless he had served five or more years in prison for the felony.[6] 8 U.S.C. § 1182(c). Although the record does not reflect how much time Wallace actually served, he was only sentenced to three years imprisonment.

With the passage of AEDPA, however, several additional classes of aliens with criminal convictions were barred relief, now regardless of the time served on the charge. AEDPA § 440(d) changed the last sentence of § 212(c) to read:

This section shall not apply to an alien who is deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) [aggravated felony], (B) [controlled substance offenses], (C) [firearms offenses], or (D)

6. When the ground of deportation was a conviction for drug trafficking, however, the alien had to show "unusual or outstanding equities." Matter of Marin, 16 I. & N. Dec. at

589. As mentioned above, because Wallace has not been permitted to apply for § 212(c) relief, there is no record of what his unusual or outstanding equities might be.

[offenses against national security], or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i) [crimes of moral turpitude].

AEDPA § 440(d), 110 Stat. 1214, 1277. Thus, Wallace, solely by dint of his conviction for possession of marijuana with intent to distribute, is now under the BIA's interpretation of AEDPA, barred from seeking § 212(c) relief in his deportation proceeding. *See id.*

But the language of AEDPA's § 440(d) was curious. It eliminated § 212(c) relief for any "alien who is *deportable* by reason of having committed any criminal offense." *See* ADEPA § 440(d) (italics added). It made no mention of aliens in exclusion proceedings.[7] Resolving the question, on May 14, 1997, the BIA held that § 440(d) did *not* apply to aliens in exclusion proceedings, but did apply to aliens in deportation proceedings. *In Re Fuentes Campos,* Int. Dec. (BIA) 3318, 1997 WL 269368 (May 14, 1997) (lawful permanent resident applying for re-entry into United State who was deemed excludable—due to controlled substance offense conviction—permitted to apply for § 212(c) relief).

AEDPA was followed by the enactment of Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") on April 1, 1997. IIRIRA repealed § 212(c) as amended by AEDPA § 440(d), eliminating that relief entirely as to those in both exclusion and deportation proceedings. Pub.L. 104–208, Div. C, Title III, § 304(b), Sept. 30, 1996, 110 Stat. 3009–597. IIRIRA § 304(a)(7) unmistakably consolidates "deportation" and "exclusion" proceedings

into a single category—"removal" proceedings; it then bars § 212(c) relief to all immigrants in such proceedings. While IIRIRA would have ended the exclusion/deportation debate in this case, the applicable provision of the IIRIRA was expressly made prospective, applying only to those proceedings commenced after April 1, 1997.[8] IIRIRA, § 309(c), *Goncalves,* 144 F.3d at 116.

## B. *Equal Protection*

In this relatively small window—between the old law and the new, when the BIA legitimized the deportation/exclusion distinction—the Equal Protection debate still rages. Wallace argues that the BIA's interpretation of § 440(d), denying § 212(c) relief to deportable aliens, while still permitting those in exclusion proceedings to apply, is irrational and arbitrary, not in furtherance of a legitimate governmental interest. As such, it violates the Equal Protection guarantees of the Due Process Clause of the Fifth Amendment.

Apart from Wallace, the argument applies to a narrow category of aliens: (a) who would have been eligible for § 212(c) relief, had it been available, (b) whose deportation proceedings were still pending as of the effective date of IIRIRA (April 1, 1997),[9] and thus not affected by IIRIRA, and (c) whose application for relief was denied by the BIA after the *Fuentes Campos* decision permitted an alien in exclusion proceedings, but not one in deportation proceedings to apply. *See Farquharson v. INS,* 1999 WL 9662 (D.N.J.); *Almon,* 13 F.Supp.2d at 146; *Jurado–Gutierrez,* 977 F.Supp. at 1092–93.

---

**7.** Excludable aliens, defined in 8 U.S.C. § 1182(a) are those who may be denied re-entry into the United States.

Deportable aliens, are defined in 8 U.S.C. § 1227(a) as those who reside within the United States, but who may be deported out of the country. *See Jurado–Gutierrez,* 977 F.Supp. at 1092.

**8.** Although the statute does not expressly state what initiates removal proceedings, the first

provision in 8 U.S.C. § 1229, which describes the process of initiating removal proceedings, indicates that a "notice to appear" shall be given in person to the alien. This replaces the previous "Order to Show Cause."

**9.** As stated above, the IIRIRA effectively eliminated § 212(c) relief for both categories of aliens, with certain exceptions, not applicable to Wallace. IIRIRA § 304(b).

The distinction that the BIA would apply to aliens under AEDPA is identical to a distinction litigated—and resoundingly disfavored—over the past two decades. As noted above, in *Francis v. INS*, 532 F.2d 268 (2nd Cir.1976), the BIA interpreted what it believed to be the plain meaning of § 212(c), as providing discretionary relief only to those legal resident aliens in exclusion proceedings, and not those in deportation proceedings. *See Francis*, 532 F.2d at 270–72. Francis challenged the BIA's interpretation on the grounds that deportable and excludable immigrants were "similarly situated" in relation to § 212(c), and as such, that their differential treatment violated Equal Protection. *See id.* at 272.

While the Second Circuit acknowledged Congress' "virtually unrestricted" authority to regulate the admission and retention of aliens, it also recognized the well-established principle that Equal Protection and Due Process protections apply to aliens as well as citizens. *See id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). At the same time, because a permanent resident alien's right to remain in the country is not a "fundamental right," nor are aliens a suspect class which would demand a strict scrutiny review, the Court applied a minimal scrutiny test. *See id.* The minimal scrutiny test was defined as requiring that:

> distinctions between different classes of persons must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. *Id.*

Congress' purpose in enacting § 212(c) was to "allow a degree of flexibility to permit worthy returning aliens to continue their relationships with family members in the United States despite a ground for exclusion." *Id.* According to the Court, however, there was no reason to suggest that an alien's failure to travel abroad following his conviction—making him deportable not excludable—should somehow be a pivotal factor in determining the equities of his remaining in this country. *Id.* Accordingly, the distinction failed even the minimal scrutiny test. The remedy, the Court found, was to hold the BIA's interpretation of § 212(c) unconstitutional as applied to Francis and extend to him the right to apply for § 212(c) relief.

The *Francis* holding was implemented by the BIA, and universally accepted by courts of appeals, including the First Circuit. *See In re Silva*, 16 I.& N.Dec. 26, 1976 WL 32326 (BIA 1976); *Campos v. INS*, 961 F.2d 309 (1st Cir.1992). But with its recent decision in *Fuentes–Campos*, the INS resurrects the disfavored deportation proceeding/exclusion proceeding test—with no greater legitimacy and no more successfully.

Respondents argue first that the plain language of § 440(d) requires the result reached in Wallace's case. I see no such clarity. On its face, § 212(c) expressly applied to *excludable* lawful permanent residents "who temporarily proceeded abroad voluntarily ... and who are returning to a lawful unrelinquished domicile...." Section 440(d) is nowhere as explicit; it applies to an "alien who is *deportable* by reason of having committed any criminal offense." AEDPA § 440(d) (italics added). It did not define the two groups in the language of the case law—in deportation proceedings or in exclusion proceedings. Additionally, nothing in the legislative history suggests Congressional intent to reinstitute this distinction.

Even if Congress did re-enact this distinction, it fares no better under minimal scrutiny test than did the provisions challenged in *Francis.*[10] Respondents, at-

**10.** There is no question that Wallace has shown that he was denied the right to apply for § 212(c) relief, while an excludable immigrant was given this opportunity. He points to the BIA's May 14, 1997, decision in *Fuentes–Campos,* after which at least one immigrant (the petitioner in that case) in the midst of exclusion proceedings, was in fact

tempting to distinguish AEDPA from the earlier case law, argue that Congress intended the legislation to further its goal of "expel[ling] [criminal] aliens as quickly as possible from the United States." AEDPA, they suggest, represents the appropriate legislative approach of 'taking one step at a time'—first, applying the law to immigrants in deportation proceedings, and later applying it to those in exclusion proceedings.

The same argument was rejected in *Francis*. In *Francis*, the court found that applying a § 212(c) waiver first to immigrants in exclusion proceedings and then to immigrants in deportation hearings would not be a fair or rational basis for differential treatment. *See* 532 F.2d at 273. And since *Francis* and its progeny made § 212(c) available to resident aliens in deportation proceedings for the past twenty years, I am not convinced the Congress has the right to wipe it out for only one group, simply because it wished to start *somewhere* in its new campaign against the "criminal alien." Even recognizing the breadth of Congress' plenary power in areas of immigration law, it is still constrained to making rational and nonarbitrary distinction between similarly situated groups.

I am also not swayed by the argument provided by the Seventh Circuit in *La-Guerre v. Reno*, 164 F.3d 1035 (7th Cir.

1998). *In dicta,* the Seventh Circuit discounted the lower court's Equal Protection finding with respect to the exclusion/deportation distinction. *See id.* at 1041. It found that there was a rational reason for Congress' more lenient treatment of excludable as distinct from deportable aliens—namely to create an incentive for deportable aliens to leave the country voluntarily, by permitting them the possibility of a waiver if they then decided to return at a later time. *See id.*

Plainly, that rationale could well have applied during the preceding twenty years, when these distinctions were invalidated. In any event, the argument does not make sense. There is no rational basis for allowing a legal resident alien who has left the country on a short trip to apply for a discretionary waiver, while denying that opportunity to another immigrant, only because he has not traveled out of the country. *See e.g. Thompson,* 1998 WL 473471; *Musto v. Perryman* 1998 WL 242151 (N.D.Ill.); *Almon,* 13 F.Supp.2d 143; *Jurado–Gutierrez,* 977 F.Supp. 1089; *Vargas v. Reno,* 966 F.Supp. 1537 (S.D.Ca.1997); *see also Farquharson,* 31 F.Supp.2d 403, 416 n. 16 (addressing in dicta). Indeed, under this scenario, a legal resident alien who commits a crime could escape the more stringent AEDPA provisions just by taking a quick trip outside the country—overnight in Canada, for example. Upon return, if placed in exclusion proceedings,

permitted to apply for § 212(c) relief, regardless of AEDPA's prohibitions. *See e.g. Almon,* 13 F.Supp.2d at 145 (citing *Fuentes–Campos,* Int.Dec. (BIA) 3318). Section 440(d) was then cited on May 15, 1998, almost one year later, as the basis for cutting off § 212(c) relief to Wallace.

Nor is there any question that deportable and excludable immigrants are similarly situated with respect to § 440(d), just as *Francis* and its progeny held when addressing the same distinction pressed by the INS pre-AEDPA. To be sure, with respect to certain issues, such as the degree of procedural protection they are afforded, deportable and excludable immigrants have been found to be "differently situated." *See Landon v. Plasencia,* 459 U.S. 21, 31, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (Supreme Court held that

an excludable immigrant did not have the same due process rights of a deportable immigrant and was not entitled to the same procedural protections offered in a deportation proceeding). But nothing about AEDPA suggests that where the availability of § 212(c) relief is concerned, the law can reasonably distinguish between aliens in deportation and exclusion proceedings, who are similarly situated for the purposes of applying for § 212(c). *See Francis,* 532 F.2d at 273; *Thompson v. Perryman,* 1998 WL 473471 (N.D.Ill.); *Almon,* 13 F.Supp.2d 143; *Jurado-Gutierrez,* 977 F.Supp. 1089. Indeed, reading *Landon* and *Francis* together suggests that deportable aliens may have historically had greater rights than excludable aliens, not fewer.

he would be granted the opportunity to apply for a § 212(c) waiver. If § 212(c) were then granted, he could re-enter the United States without further repercussions. And, admitted under such a waiver, he could not subsequently be deported for the criminal conviction that was the subject of the waiver. *See Thompson* 1998 WL 473471 at *8 (citing *In re Mascorro-Perales*, 12 I. & N.Dec. 228, 229 (BIA 1967)). Instead of removing "criminal aliens" from the country expeditiously, respondents' interpretation would allow some to avoid deportation with comparative ease. Accordingly, I find that

§ 440(d), as interpreted by the BIA in *Fuentes-Campos*, violates Wallace's equal protection rights.[11]

█ Having found an equal protection guarantee violation, I must address the appropriate remedy. Courts have differed on this issue. In *Almon*, 13 F.Supp.2d at 147 and *Jurado-Gutierrez*, 977 F.Supp. at 1094–95, the courts allowed a discretionary hearing pursuant to pre-AEDPA § 212(c), while in *Vargas*, 966 F.Supp. at 1548, the court found that as IIRIRA corrected any constitutional problems, there was no ongoing violation to be remedied. I am per-

**11.** Put otherwise, § 440(d), as interpreted by the BIA, is under-inclusive vis a vie the proposed legislative goal of expediting the deportation of "criminal aliens." It bars § 212(c) relief, as the BIA says, only with respect to deportable aliens, not excluded aliens.

Under a minimal rationality test, this under-inclusive classification must be "rationally" related to some legislative objective. *See Romer v. Evans*, 517 U.S. 620, 631–32, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). As one scholar described it, where there is only a "minimal scrutiny" test, the law permits more of a "misfit" between purpose and classification, than is permitted under a strict scrutiny test. *See* Kenneth Simons, *Overinclusive and Underinclusive: A New Model*, 36 UCLA L.Rev. 447, 449 (1989); *see also Romer*, 517 U.S. at 632, 116 S.Ct. 1620 (in an ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or ... if the rationale for it seems tenuous).

If the respondents are correct in this case, almost any under-inclusive statute could be justified by the Government's desire to "start somewhere." *See Semler v. Oregon State Board of Dental Examiner*, 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086 (1935) (although state not have to deal with like evils at the same time, distinction must be rationally related to legislative objective). The rationale would be one thing if the Government was operating on a clean slate—no discretionary relief for anyone. But here, there is a history of twenty years of discretionary relief being made available to both excludable and deportable aliens. The withdrawal of that relief, without any other basis, raises more serious constitutional questions which are not addressed by the provided legislative goals.

Similarly, in *Romer v. Evans*, 517 U.S. at 623–25, 632, 635, 116 S.Ct. 1620, the Court struck down Colorado's Amendment 2, which

repealed existing local ordinances that had affirmatively granted protection from discrimination against homosexuals—disqualifying a class of persons from the right to seek specific protection form the law. The Court found that unlike other cases cited, where the laws challenged were grounded in a sufficient factual context to ascertain that there existed some relation between the classification and the legitimate legislative end, Colorado's act failed even the minimal rationality test. *See id.* at 631–32, 116 S.Ct. 1620 (citing e.g., *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)).

The Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee et al.*, — U.S. ——, 119 S.Ct. 936, 946, 142 L.Ed.2d 940 (1999), does not suggest otherwise. The Court, interpreting the IRRIRA, held that district courts lacked jurisdiction for direct review of a First Amendment claim of being targeted for deportation because of affiliation with a politically unpopular group—ostensibly, selective prosecution by the INS. *See Reno*, 119 S.Ct. at 946–47. The decision to initiate a deportation proceeding, like the decision to initiate a criminal proceeding, trenches on the broad discretion of the executive. *See id.*

Those discretionary decisions raise a different question than the one presented here—namely the ability to apply for discretionary relief. It would be one thing if this claim challenged the IJ's failure to grant the relief—a discretionary decision—assuming it was available to all aliens. Instead, Wallace's claim is more like procedural arguments for due process protections in that it is about denying a deportable alien the opportunity to argue for the discretionary relief in the first instance.

suaded by the decisions in *Almon* and *Jurado–Gutierrez.*

If the law had been interpreted in a constitutional manner at the time when Wallace was in deportation proceedings, he would have been permitted the opportunity to apply for § 212(c) relief. The fact that IIRIRA subsequently closed this door to both excludable and deportable aliens makes no difference to the equities in this case.

The only way to remedy the failure to treat Wallace in a constitutional way is to give him that opportunity now. *See Almon,* 13 F.Supp.2d at 147; *Jurado–Gutierrez,* 977 F.Supp. at 1093–94. Pursuant to this court's broad, equitable powers to remedy violations of constitutional rights, I find that the appropriate remedy is to remand to the BIA for a discretionary hearing on the merits of Wallace's application for relief under the old INA § 212(c). *See Almon,* 13 F.Supp.2d at 147; *see also* Evan H. Caminker, *A Norm–Based Remedial Model for Underinclusive Statutes,* 95 YALE L.J. 1185, 1185–87 (1986).

### III. *CONCLUSION*

Wallace committed a drug offense for which he was later convicted and rendered deportable. The INS issued an Order to Show Cause on October 15, 1996; Wallace's deportation hearing began on April 17, 1996—seven days before AEDPA § 440(d) eliminated § 212(c) relief for deportable immigrants convicted of the crime Wallace committed. On May 14, 1997, the BIA held in *Fuentes–Campos,* Int.Dec. (BIA) 3318, that excludable immigrants were exempt from § 440(d), which exactly one year and a day later, the BIA applied to Wallace; since Wallace was in deportation proceedings not exclusion proceedings, the BIA found that he had no right to apply for § 212(c) relief. There is no rational basis for this distinction; even under the minimal scrutiny test, Wallace's equal protection rights have been violated.

To remedy this violation, this case is remanded to the BIA for a discretionary

consideration of the merits of Wallace's application for relief. I express no opinion as to the merits of his application.

**SO ORDERED.**