**UNITED STATES of America, Plaintiff–Respondent,**

v.

**Abdel–Karim A. EL–NOBANI, Defendant–Petitioner.**

Nos. 4:96CR394, 4:99CV2550.

United States District Court, N.D. Ohio, Eastern Division.

May 2, 2001.

Margaret W. Wong, Esq., Mark Edward Rentz, Esq., Scott Roger Hurley, Esq., Law Offices of Margaret Wong & Associates, Cleveland, OH, for Abdel–Karim A. El–Nobani, petitioner.

Thomas J. Gruscinski, Esq., Office of U.S. Attorney, Cleveland, OH, for United States of America, respondent.

## MEMORANDUM AND ORDER

ALDRICH, District Judge.

Defendant-petitioner Abdel–Karim A. El–Nobani, a legal permanent resident of the United States, pled guilty to this Court on February 10, 1997, and this Court sentenced him to two years probation with four months home confinement on December 4, 1998. Pursuant to 28 U.S.C. § 2255, El–Nobani now seeks to vacate his plea and to set aside his conviction because his plea was not knowing, voluntary, and intelligent. El–Nobani argues that his plea was not knowing, voluntary, and intelligent, because he was not aware that his plea would automatically lead to his deportation, and because he received inaccurate advice from the prosecutor regarding his likelihood of deportation.

El–Nobani's mistaken beliefs regarding his deportability were a result of the dramatic changes in immigration law brought about by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009 (1996) ("IIRIRA"). IIRIRA was enacted on September 30, 1996, prior to El–Nobani's guilty plea and, while it did not go into effect until April 1, 1997, its relevant provisions are completely retroactive and apply to El–Nobani's February 10, 1997 conviction. IIRIRA converted El–Nobani's convictions from offenses that were highly unlikely to lead to deportation, to offenses that automatically require deportation. Despite the fact that IIRIRA had already been enacted when El–Nobani pled guilty, neither this Court, nor the Assistant United States Attorney ("AUSA") prosecuting this case, had any knowledge or suspicion that such dramatic shifts in immigration law were imminently and inevitably lurking when El–Nobani entered his plea.

Following a hearing on January 14, 2000, and substantial briefings by the parties, this Court holds that El–Nobani's plea must be vacated on two separate and independent grounds. First, this Court finds that Rule 11 of the Federal Rules of Criminal Procedure requires district court judges to warn alien defendants of the deportation consequences of their guilty pleas. Since this Court failed to so warn El–Nobani and since he had no independent knowledge of those consequences, El–Nobani's plea must be vacated as it was

not made knowingly, voluntarily, and intelligently. Second, regardless of whether or not Rule 11 required this Court to inform El–Nobani of the deportation consequences of his plea, El–Nobani's plea still must be vacated, because he reasonably relied on misrepresentations by the prosecutor.

## I. Background

Abdel–Karim A. El–Nobani is a legal resident of the United States, is married to a natural born United States citizen, and is the father of two natural born United States citizens, ages two and eight, respectively. He was born in Jordan and moved to the United States in 1988. El–Nobani became a permanent resident of the United States in 1993.

On December 13, 1996, El–Nobani was indicted by a federal grand jury on five counts of conspiracy to traffic in food stamps, the harboring of an illegal alien, and money laundering. On January 31, 1997, El–Nobani, accompanied by his lawyer, met with the AUSA prosecuting the case for a proffer session to negotiate a plea. Also present were Special Agent Paul Waigand from the Internal Revenue Service and Special Agent James Owens from the Department of Agriculture.

At the January 31, 1997 meeting, El–Nobani and his lawyer queried the AUSA and the special agents as to the effect a guilty plea would have on El–Nobani's citizenship application, which was in process at the time. Special Agent Owens, who, prior to working for the Department of Agriculture, had worked at the Immigration and Naturalization Service ("INS"), testified to this Court that he told El–Nobani that his citizenship application would be delayed and that he would not be eligible for citizenship for five years. Owens and Waigand also testified that they, along with the AUSA, discussed with El–

Nobani the deportation consequences of convictions on the various crimes charged in the indictment. Owens testified that he told El–Nobani that a conviction for money laundering might be considered an "aggravated felony" and might result in his deportation/removal from the United States. Owens additionally testified that he told El–Nobani that while the harboring of an illegal alien charge and the food trafficking charge were deportable crimes, it was highly unlikely that the INS would deport someone like El–Nobani for those crimes.

El–Nobani testified to this Court that at the time of the proffer session, he did not know the meaning of the term deportation and does not remember whether it was discussed. The government submitted a brief affidavit prepared by El–Nobani's former lawyer, in which he states that Agent Owens spoke with El–Nobani about El–Nobani's immigration status.

After the proffer session, El–Nobani agreed to plead guilty to one count of conspiracy to traffic in food stamps and one count of harboring an illegal alien and to fully cooperate with the government's ongoing investigation and prosecution. In exchange, the government agreed to dismiss the other three counts, including the money laundering charges, to recommend to the court a two level reduction in El–Nobani's sentencing category for his acceptance of responsibility, and to consider, based on the quality of El–Nobani's cooperation, filing a § 5K1.1 motion for a two level downward departure.

Subsequently, El–Nobani pled guilty to this Court on February 10, 1997. When this Court took the plea, it advised El–Nobani of the maximum and minimum penalties for his offenses and queried El–Nobani on whether he understood the rights he was waiving and whether his plea was voluntary. The Court did not, however, advise El–Nobani that his guilty plea

would automatically result in his deportation, or even warn El–Nobani that there might be deportation consequences to his plea. At the time, like everyone else involved in this case, this Court had no knowledge or suspicion that the recently enacted IIRIRA would have such a profound effect on immigration law in general and on El–Nobani's case in particular. Had this Court known, it would have warned El–Nobani about the inevitable deportation consequences of his plea.

Following his guilty plea, El–Nobani cooperated with the government for nearly two years (the indictment of El–Nobani included eleven other defendants). El–Nobani finally came before this Court for sentencing on December 4, 1998. Relying heavily on the AUSA's § 5K1.1 motion for a two level decrease based on El–Nobani's lengthy cooperation, this Court sentenced El–Nobani to two years probation, with four months of home confinement with electronic monitoring.

On March 10, 1999, the INS served a Notice to Appear on El–Nobani, initiating removal[1] proceedings against El–Nobani. El–Nobani testified to this Court that when he received the notice, he did not understand the nature of the notice, but that when he discovered that the INS wanted to permanently remove him from the country, he promptly consulted an immigration attorney. Based on that attorney's advice, El–Nobani collaterally attacked his sentence, asking this Court to vacate his plea on the grounds that it was not made knowingly, intelligently, and voluntarily. In order to ensure that justice was achieved, on November 23, 1999, this Court ordered a stay of the INS proceedings until this Court could rule on El–Nobani's claim. This Court held an evi-

dentiary hearing on January 14, 2000 and received briefs from both parties. In addition to the evidence described above, the affidavit from El–Nobani's lawyer, received by this Court at the evidentiary hearing, states that El–Nobani's lawyer discussed El–Nobani's immigration status with El–Nobani, informed El–Nobani that he could be subject to deportation, and recommended that El–Nobani consult an immigration specialist. The affidavit, however, does not include any indication of exactly when these statements were made to El–Nobani.

## II. The New Immigration Laws

Unbeknown to this Court, the AUSA, El–Nobani, and everyone else involved in this case, a few months before El–Nobani pled guilty, Congress dramatically altered the landscape of immigration law. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified as amended in scattered sections of 8, 15, 18, 22, 28, 40, 42, and 50 U.S.C.) was enacted on April 24, 1996 and IIRIRA was enacted on September 30, 1996. Prior to the passage of these two laws, legal alien residents of the United States who had committed deportable offenses could apply to the Attorney General for discretionary relief from deportation. *See* pre-IIRIRA 8 U.S.C. § 1182(c). This process was commonly referred to as " § 212(c)" relief.[2]

While § 212(c) relief was technically discretionary in nature, it is well recognized by the federal courts that if a person's crime was relatively minor, and if his equities were great, the alien would not be deported. *See Mojica v. Reno*, 970 F.Supp. 130, 175–178 (S.D.N.Y.1997), *aff'd in part dismissed in part, Henderson v. INS*, 157 F.3d 106 (2d Cir.1998) (stating

---

**1.** Under the new statutes, "deportation" is now called "removal."

**2.** This relief was created in § 212(c) of the Immigration and Nationalization Act.

this proposition based on the "established practice of the Bureau of Immigration Affairs" and discussing § 212(c) relief at great length); *Wallace v. Reno,* 24 F.Supp.2d 104, 110–112 (D.Mass.1998), *aff'd,* 194 F.3d 279 (1st Cir.1999) (discussing the importance of § 212(c) relief and aliens' reliance upon it in pleading guilty). Someone like El–Nobani, who was a first time offender for a relatively minor offense, who did not serve jail time, who provided exemplary cooperation to the government, who was a long time resident of the United States, married to a United States citizen and the father of young United States citizen children, was virtually guaranteed to receive § 212(c) relief (if the INS even bothered to initiate deportation proceedings). Thus, prior to the passage of AEDPA and IIRIRA, Special Agent Owens's advice to El–Nobani, that it was highly unlikely that he would be deported for pleading guilty to charges of harboring an illegal alien and trafficking in food stamps, but that he might be deported if he was convicted of those charges *and* of money laundering (an offense considered more "suspect" by INS, according to Agent Owens), would have been correct. The new laws changed all that.

Prior to the passage of AEDPA, § 212(c) relief was available to all aliens, except those convicted of aggravated felonies *and* who served at least a five year term of imprisonment. 8 U.S.C. § 1182(c) (repealed by IIRIRA). AEDPA broadened the category of crimes that made aliens ineligible for § 212(c) relief; nevertheless, El–Nobani would still have qualified for § 212(c) relief under AEDPA alone. IIRIRA, however, had two substantive effects on El–Nobani's status. First, IIRIRA amended the definition of aggravated felony to include the harboring of an illegal alien. 8 U.S.C. § 1101(a)(43)(N). Second, IIRIRA eliminated § 212(c) relief, repealing 8 U.S.C.

§ 1182(c). Under IIRIRA, the only discretionary relief is codified in 8 U.S.C. § 1229b. The only aliens eligible are those who have been lawfully admitted for at least five years, have resided in the United States for at least seven years, *and* have not been convicted of an aggravated felony (under the new laws, "aggravated" felony includes a very broad category of crimes). Since IIRIRA converted El–Nobani's harboring of an illegal alien conviction into an aggravated felony and eliminated § 212(c) relief, El–Nobani is not entitled to any relief from removal/deportation under the current state of the law.

IIRIRA was enacted on September 30, 1996, prior to any of the relevant events in this case. While, IIRIRA did not officially take effect until April 1, 1997, all of the relevant provisions applied retroactively. Further, while IIRIRA is a complex statute, amending a variety of sections of the United States Code, its provisions relevant to this case are clear and unambiguous. Consequently, the effects of IIRIRA on El–Nobani's case were entirely foreseeable in January–February of 1997. Nevertheless, it is undisputed that when El–Nobani pled guilty to this Court, no person relevant to this case, including this Court and the AUSA, had even the slightest inkling of the drastic changes in immigration law being made by IIRIRA.

### III. Findings of Fact

After weighing all the evidence, this Court finds that El–Nobani made his decision to plead guilty relying on the law as he understood it and as it had been explained to him. While he might potentially have been deported for the crimes to which he plead (the government having agreed to dismiss the money laundering count), it was highly unlikely that he would have been summarily deported, and most

912

likely that he would have had an opportunity to present his case to an immigration judge. Although El–Nobani may not have understood what Agent Owens was talking about during the proffer session, El–Nobani's lawyer did, and imparted this information to El–Nobani. This Court also finds, considering that only ten days elapsed between the proffer session and the plea, that El–Nobani's lawyer's advice that El–Nobani should consult an immigration specialist most likely was not given, or acted upon, until after El–Nobani had pled guilty.

This Court additionally finds that the AUSA and his agents misrepresented the effect pleading guilty would have on El–Nobani's immigration status. These misrepresentations were not intentional. On the contrary, this Court finds that the AUSA did everything he thought possible and reasonable to structure a plea arrangement whereby El–Nobani *would not* be subject to deportation. Unfortunately, however, this Court finds that the AUSA's misrepresentations, however innocently made, influenced El–Nobani's decision to plead guilty.

## IV. Procedural Bars

The government argues that this Court should dismiss El–Nobani's case without reaching the merits on the basis of a number of procedural arguments. This Court rejects each of those arguments and will address each in turn.

■ First, the government argues that in his plea agreement, El–Nobani waived his right to appeal his sentence. A defendant may waive his right to appeal his sentence in a plea agreement, *see Watson v. United States*, 165 F.3d 486, 488 (6th Cir.1999); however, the waiver, like the plea itself, must be made knowingly, voluntarily, and intelligently, and a defendant cannot waive his right to challenge his waiver and plea on the basis that they were not made knowingly, voluntarily, and intelligently. *See Watson*, 165 F.3d at 488. Since this Court holds that El–Nobani's plea was not made knowingly, voluntarily, and intelligently, the same applies to the waiver included in that plea. Therefore, in this limited context, El–Nobani's waiver does not bar his claim.

■ The government next argues that El–Nobani procedurally defaulted his habeas claim by not challenging his plea on direct review. The government is correct; by not challenging his plea on direct review, El–Nobani procedurally defaulted his habeas claim. *See Bousley v. United States*, 523 U.S. 614, 622–23, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). When a claim has been procedurally defaulted, "the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice...or that he is actually innocent." *Id.* at 622, 118 S.Ct. 1604. This Court finds that El–Nobani has shown cause and prejudice. El–Nobani's "cause" is that he reasonably did not know that he would be deported for his offenses, received misinformation on this point from the prosecutor, and was still reasonably unaware when the time for direct appeal had run. His prejudice is that, if El–Nobani had known that the plea would result in automatic deportation, he would not have pled guilty.

■ Finally, the government argues that El–Nobani's delay in filing his motion prejudiced the government's case for a future trial, because one witness has been deported and one witness is dead. Under Rule 9(a) to 28 U.S.C. § 2255, the Court has the discretion to dismiss the motion if the government is prejudiced in its ability to respond. "Such dispositions are drastic and final," and "[t]hey should be entered only when the evidence before the court

fully satisfies the standards required in the rule." *United States v. Gutierrez,* 839 F.2d 648, 651 (10th Cir.1988). While the government's case may be more difficult to prove at a second trial, this Court does not find that El–Nobani's delay in filing his § 2255 motion was intentional, or designed in any way to prejudice the government. When he discovered and understood that the INS was going to remove him from the United States, he promptly consulted an immigration attorney who timely filed a § 2255 motion on his behalf. The Court finds that any prejudice to the government is not sufficient to dismiss El–Nobani's § 2255 claim without reaching the merits.

## V. Rule 11

■ Rule 11 of the Federal Rules of Criminal Procedure requires that, prior to accepting a guilty plea, a district court must inform the defendant of the direct consequences of that plea and inquire into the voluntariness of that plea, in order to ensure that the defendant understands the nature of the charges against him, is pleading free of coercion, and understands the consequences of his guilty plea. *See* Fed.R.Crim.P. 11; *United States v. Isom,* 85 F.3d 831, 835 (1st Cir.1996). Rule 11 does not require district courts to warn or inform defendants of the collateral consequences of their convictions. *See Cuthrell v. Patuxent Institution,* 475 F.2d 1364, 1365–66 (4th Cir.1973). El–Nobani argues that this Court erred by not informing him of the deportation consequences of his plea. The government counters that this

Court was not required to warn El–Nobani of deportation consequences, because deportation is a collateral consequence of conviction, not a direct consequence.

The Sixth Circuit has never directly addressed this issue in this context;[3] however, numerous other Circuit Courts have held that district court judges are not required to inform alien defendants of the deportation consequences of their pleas, because deportation is a collateral consequence of pleading guilty. *See e.g. United States v. Romero–Vilca,* 850 F.2d 177, 179 (3d Cir.1988); *United States v. Campbell,* 778 F.2d 764, 767–69 (11th Cir.1985). In reaching this conclusion, courts have generally relied on at least one of two propositions: first, that deportation is not directly part of a defendant's punishment or sentence, *Kincade v. United States,* 559 F.2d 906, 909 (3d Cir.1977); and/or second, that deportation is controlled by another agency over which the trial judge has no control *see Michel v. United States,* 507 F.2d 461, 465 (2d Cir.1974). El–Nobani argues, however, that in light of the dramatic changes made by IIRIRA and AEDPA, virtually eliminating any discretion by the INS in deportation/removal proceedings (and all discretion in most cases, including El–Nobani's case), this Court should find that deportation (or "removal") is a direct consequence of conviction for resident aliens in some specific cases.

The enactments of AEDPA and IIRIRA have eliminated virtually all discretion on the part of the INS and, under the current

---

**3.** The Sixth Circuit, in an unpublished opinion, has declared deportation to be a "collateral consequence of a guilty plea" in the context of determining whether or not a plea was voluntary when defense counsel failed to warn the defendant of deportation consequences. *Ogunbase v. United States,* 924 F.2d 1059 (6th Cir.1991) (unpublished). In another unpublished opinion, the Sixth Circuit quoted a lengthy section of the trial court's

opinion, for an unrelated purpose, which included the statement that "deportation is also a collateral consequence of a guilty plea and, therefore, need not be explained to a defendant in order to insure that the plea is voluntary." *United States v. Daas,* 67 F.3d 300 (6th Cir.1995) (unpublished). It is highly significant that both of these cases, of course, predate the enactment of IIRIRA and AEDPA.

state of the law, deportation is often a direct and inevitable result of an alien defendant's conviction. Prior to AEDPA and IIRIRA, any legally admitted alien resident who had not committed an "aggravated felony" *and* had not served a prison term of five years or more, could apply to the INS for discretionary relief from deportation (" § 212(c) relief"). While § 212(c) relief was "discretionary" in nature, it is well documented, as was discussed *infra*, that such relief was substantive, and that a first time offender, serving a minimal sentence, with extenuating circumstances (such as a natural born spouse and children) would be all but guaranteed relief from deportation. This Court takes judicial notice of the fact that deportation consequences are often of far greater concern for legal aliens than any prison sentence they might receive. *See also Mojica v. Reno*, 970 F.Supp. 130, 175–178 (S.D.N.Y.1997) (discussing in great detail the substantive nature of § 212(c) relief and how, in many instances, deportation is a much more significant concern for alien defendants than jail time); and *Wallace v. Reno*, 24 F.Supp.2d 104, 110–112 (D.Mass.1998). Thus, under the earlier laws, deportation was rarely a direct result of conviction and its determination was in the hands of an agency over which the trial court had no control.

AEDPA and IIRIRA have changed this dynamic. Prior to these laws, "aggravated felonies" were serious crimes, such as murder, drug and weapon trafficking, money laundering, and other crimes of violence. After AEDPA and IIRIRA, the definition of aggravated felony has been expanded to include fraud, alien smuggling, tax evasion, perjury, bribery, failure to appear before a court, forgery, and other crimes that are surprisingly now defined as "aggravated" felonies.[4] *See* 8 U.S.C. § 1101(a)(43)(A-U). Further, IIRIRA eliminated the provision that only defendant aliens who were required to serve a five year prison sentence were ineligible for discretionary relief. Under the current law, the only aliens eligible for any discretionary relief are those who have fulfilled residency requirements[5] and have not committed any of the new long list of aggravated felonies, regardless of time served (even, as in El–Nobani's case, when no time was served). 8 U.S.C. § 1229b. Consequently, under the current state of the law, deportation is a direct and inevitable result of conviction for alien residents in the majority (if not the vast majority) of cases.[6] It can no longer be claimed that deportation is a consequence that will be determined by an agency outside of the trial court's control.

The government additionally argues that deportation must be considered collateral because it is not a punishment. Although the Supreme Court has declared deportation to technically not be a punishment, in terms of a sentence imposed by the court,

---

4. Many of these crimes would not even have been felonies at all, at common law.

5. Lawfully admitted for five years and continuously residing for seven years.

6. The government argues that, even if deportation is now considered a direct result of conviction, it should still be considered a collateral consequence, because many other direct results of conviction, that do not directly relate to length of sentence, are considered collateral, such as the right to vote, *Waddy v. Davis*, 445 F.2d 1 (5th Cir.1971), loss of the right to foreign travel, *Meaton v. United States*, 328 F.2d 379 (5th Cir.1964), and suspension of a driver's license, *Moore v. Hinton*, 513 F.2d 781 (5th Cir.1975). Deportation, however, is a significantly more severe deprivation than those listed above. This Court is not holding that a judge must warn a defendant of *all* consequences that may directly result from a guilty plea, but rather that deportation is more akin to minimum and maximum sentence, than to loss of the right to vote, to drive, or to travel abroad.

it is well recognized that this distinction is technical in nature and that deportation *does* have the substantive aspects of punishment. *See e.g. Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) (declining to overturn previous Supreme Court precedent, but commenting that the "intrinsic consequences of deportation are so close to punishment for crime"); *Fong Yue Ting v. United States,* 149 U.S. 698, 740, 13 S.Ct. 1016, 37 L.Ed. 905 (1893) (Brewer J., dissenting) ("Everyone knows that to be forcibly taken away from home, and family, and friends, and business, and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel."); and *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) (deportation is "a penalty" and "a drastic measure and at times the equivalent of banishment or exile"). Further, while it can be said that deportation is not directly part of a defendant's sentence, deportation clearly has every other quality of a punishment, in light of IIRIRA and AEDPA. Indeed, as already discussed, deportation is often a more severe punishment than any sentence imposed by the court and, since deportation is now automatic for a whole host of minor crimes, it will likely be a significantly harsher punishment than the judge's sentence in many, if not most, cases in the future. Holding that deportation is not a "direct consequence" of conviction, solely on the basis that it is technically not a punishment imposed by the court, is a semantical parsing of form over substance that this Court finds abhorrent.

In contrast to the federal courts' unwillingness to take responsibility for insuring that alien residents knowingly and intelligently decide to plead guilty, is a growing trend in many states to require that judges inform alien defendants of possible deportation consequences of their guilty pleas. Such a law has been passed in Ohio, *see* O.R.C. § 2943.031, so that if El-Nobani had been tried in state court, instead of federal court, he would have been adequately warned. In addition, this country's largest states, and those most influenced by immigration, New York, *see* N.Y.Crim. Proc. Law § 220.50, California, *see* Cal.Penal Code § 1016 .5, Texas, *see* Tex.Crim. Pro.Code Ann. § 26.13, and Florida, *see* Fla. R.Crim. P. Rule 3.172, have all passed similar statutes. Also, this Court is aware of at least 10 other states with similar requirements.[7] Further, state courts have been willing, in the absence of statutes, to hold that a defendant cannot make a knowing and intelligent decision to plead guilty if unaware that deportation could result from such a plea. *See e.g. People v. Padilla,* 151 Ill.App.3d 297, 104 Ill.Dec. 522, 502 N.E.2d 1182, 1186 (1986).

A number of the above states have made explicit findings that alien defendants are often unaware of deportation consequences when pleading guilty or nolo contendere and that fairness demands that defendants be aware of deportation consequences. For example, § 1016 .5(d) of the California Penal Code states:

> The Legislature finds and declares that in many instances involving an individual who is not a citizen of the United States charged with an offense punishable as a crime under state law, a plea of guilty or nolo contendere is entered without the defendant knowing that a conviction of

---

7. Connecticut, Conn. Gen.Stat. 54–1j, Hawaii, Haw.Rev.Stat. § 802E–2, Massachusetts, Mass. Gen. L. ch. 278 § 29D, Montana, Mont.Code Ann. § 46–12–210, New Mexico, N.M. Cr. Form 9–406, North Carolina, N.C. Gen.Stat. § 15A–1022, Oregon, Or.Rev.Stat. § 135.385, Washington, Wash. Rev.Code Ann. § 10.40.200, Wisconsin, Wis. Stat. Ann. § 971.08, and the District of Columbia, D.C.Code 1981 § 16–713.

such offense is grounds for deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States. Therefore, it is the intent of the Legislature in enacting this section to promote fairness to such accused individuals by requiring in such cases that acceptance of a guilty plea or plea of nolo contendere be preceded by an appropriate warning of the special consequences for such a defendant which may result from the plea. It is also the intent of the Legislature that the court in such cases shall grant the defendant a reasonable amount of time to negotiate with the prosecuting agency in the event the defendant or the defendant's counsel was unaware of the possibility of deportation, exclusion from admission to the United States, or denial of naturalization as a result of conviction.

Similarly, § 10.40.200 of the Revised Code of Washington states that:

The legislature finds and declares that in many instances involving an individual who is not a citizen of the United States charged with an offense punishable as a crime under state law, a plea of guilty is entered without the defendant knowing that a conviction of such offense is grounds for deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States. Therefore, it is the intent of the legislature in enacting this section to promote fairness to such accused individuals by requiring in such cases that acceptance of a guilty plea be preceded by an appropriate warning of the special consequences for such a defendant which may result from the plea.

Rather than parse over distinctions between collateral versus direct consequences of a guilty plea, these states simply state a fundamental proposition that this Court finds compelling: it is unfair to hold an alien defendant to a guilty plea that will result in deportation when the alien defendant is ignorant or misinformed on that point. While some federal courts have also noted this unfairness, they have still held that Rule 11 does not require federal judges to warn alien defendants because deportation is a collateral consequence. However, for the reasons articulated above, this Court finds that deportation can no longer reasonably be considered merely a collateral consequence of an alien defendant's guilty plea.

This Court is not the first federal court to consider the question of whether deportation is a direct or collateral consequence of conviction in light of IIRIRA and AEDPA. In an unpublished opinion, the Tenth Circuit, with no more than two sentences of discussion, relied on its previous precedent and held that AEDPA (the decision does not mention IIRIRA) did not change the collateral nature of deportation. *United States v. Fagundes,* 1999 WL 759606 (10th Cir.1999). Additionally, the First Circuit in *United States v. Gonzalez,* 202 F.3d 20 (1st Cir.2000), while deciding the case on other grounds (finding that the defendant could not demonstrate prejudice), also indicated that they would not reverse their previous holdings that deportation is merely a collateral consequence.

■ While this Court takes note of those decisions, it respectfully disagrees with their conclusions. The precedent that those cases relied upon was derived at a time when an alien defendant's conviction did not automatically lead to deportation. Before AEDPA and IIRIRA, immigration judges could weigh an alien defendant's extenuating factors (length of residency, personal ties, etc.) with the severity of the defendant's crime, unless the defendant had committed an aggravated felony (when the term "aggravated" still had some

meaning) *and* had served at least five years in jail. This Court cannot hold that deportation is merely a collateral consequence of conviction now that most alien defendants will be automatically, and summarily, deported, even those who commit relatively minor crimes and receive no prison time.[8] Consequently, since this Court failed to warn El–Nobani of the deportation consequences of his plea, and because he was reasonably unaware of those consequences, this Court holds that El–Nobani's guilty plea was not made knowingly, voluntarily, and intelligently, and must be vacated.

## VI. Government Misrepresentation of the Likelihood of Deportation

Even if this Court accepted the government's argument that deportation is a collateral consequence, and that therefore this Court had no legal duty to inform or warn El–Nobani of the deportation consequences of his plea, El–Nobani's plea must still be vacated under the unique facts of this case. It is well settled that when a defendant's plea is "induced by inaccurate prosecutorial suggestions about its consequences...the plea cannot be considered voluntary." *United States v. Russell,* 686 F.2d 35, 41 (D.C.Cir.1982); *see also Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (stating that a guilty plea made by a defendant fully aware of the direct consequences of his plea must stand, unless induced, among other things, by misrepresentation by the court or the prosecutor); and *United States v. Parrino,* 212 F.2d 919, 921 (2d Cir.1954). In *Russell,* a defendant sought to vacate a guilty plea when the INS instituted deportation pro-

ceedings against him, arguing that he did not realize that the misdemeanor conviction he pled to subjected him to deportation. The district court, without an evidentiary hearing, dismissed Russell's case on the grounds that deportation was a collateral consequence, and not a direct consequence, of conviction and that Russell's misunderstanding of deportation consequences did not make his plea involuntary. The D.C. Circuit agreed that deportation was a collateral consequence, but held that the plea could not be termed knowing and voluntary if the defendant reasonably relied on misinformation from the government, even on a collateral matter, in deciding to plead guilty.

The *Russell* court discovered that, at the plea colloquy, the AUSA stated that if Russell was convicted under the felony count (which was dismissed) he would be subject to deportation, but that if he pled guilty to the misdemeanor count (which he did) he would not be subject to deportation. This statement, while innocently made, was wholly inaccurate. The *Russell* court, relying on the Supreme Court's opinion in *Brady,* 397 U.S. at 755, 90 S.Ct. 1463, held that Russell's plea must be vacated because it "was so clearly tainted by the possibility that he had been confused by the government" regarding the deportation consequences of his plea. *Russell,* 686 F.2d at 41. The *Russell* court further held that the fact that the misrepresentation related to a collateral, and not a direct, consequence of the conviction was irrelevant. *Russell,* 686 F.2d at 39–41 (stating that while the government has no obligation to inform defendants of the collateral consequences of their pleas, the

---

**8.** This Court also notes and applauds a growing trend, on the part of the AUSAs, at least in this district, to offer alien defendants a one to two level downward adjustment in net offense level if, in plea agreements, such defendants acknowledge their alienage and deportability, and agree not to pursue hearings in either the trial court, or the INS, on their removability, Such a procedure ensures that a plea is knowing, voluntary and intelligent.

government does have an obligation to not mislead defendants regarding those consequences). The court concluded that "although it may be permissible for prosecutors to discuss deportation consequences with defendants when their understanding of the law is accurate...the practice cannot be tolerated when the prosecution's advice is erroneous, no matter how well intended." *Russell,* 686 F.2d at 41.

The facts of this case are remarkably similar to *Russell.* It is undisputed that the AUSA and his agents gave El–Nobani and his lawyer advice on the deportation consequences of pleading guilty. *See* Government's brief of Feb. 2, 2000 at 17 ("...the unrefuted testimony of Special Agent Owens was that Owens explained the deportation consequences of aggravated felonies to El–Nobani during the January 31, 1997 proffer"). Indeed, Agent Owens was virtually presented as an expert on the matter because he had previously been an INS agent.[9] The prosecutor and his agents advised El–Nobani that the INS had discretion on whether or not to deport him and indicated that it was highly unlikely that the INS would deport El–Nobani on such minor charges: considering his length of residency, his strong familial ties to the U.S., and that it was his first offense. While this advice, like in *Russell,* was innocently given, it was wholly inaccurate. The already enacted IIRIRA, when it went into effect, retroactively eliminated any INS discretion and mandated El–Nobani's deportation. Since it was clearly foreseeable that El–Nobani's cooperation with the government, his sentencing by this Court, and the initiation of deportation proceedings by the INS could not be completed before April 1, 1997, the prosecution's advice to El–Nobani was erroneous. While not presented in the briefs, an argu-

ment by the government that the advice was an accurate description of the then current state of the law, must fail. The relevant provisions of IIRIRA unambiguously apply retroactively to El–Nobani. Unless his deportation proceedings were initiated prior to IIRIRA's effective date, IIRIRA is the only deportation law that had any relevance to El–Nobani's situation. As part of the plea agreement, El–Nobani was required to aid the government in their prosecution of numerous other defendants. There was no conceivable way that those matters would be completed, El–Nobani would be sentenced, and his removal proceedings initiated, before IIRIRA "officially" became effective. Consequently, in accordance with *Russell* and in the interests of justice, El–Nobani's plea must be vacated, because it was not made knowingly, voluntarily or intelligently.

## VII. Conclusion

This Court holds that El–Nobani's guilty plea to this Court must be vacated because it was not made knowingly, voluntarily, and intelligently. Deportation is a harsh and severe punishment and is one that is automatic for many, if not most, alien defendants under the current state of the law. If the words "knowing" and "intelligent" are to have any meaning whatsoever, it cannot be said that an alien defendant has made a knowing and intelligent decision when he pleads guilty without knowing that there are severe and automatic deportation consequences to his plea.

 This Court finds that deportation is now a direct consequence of conviction for many alien defendants, and that district courts must warn alien defendants of possible deportation consequences before taking their pleas under Rule 11. Since

---

**9.** If Owens had actually been an INS agent at the time, he presumably would have at least

been aware of IIRIRA's existence, and its consequences.

this Court did not so advise El–Nobani, and since he was unaware and misinformed regarding the deportation consequences of his plea, his plea must be vacated. Further, even if Rule 11 does not apply here, El–Nobani's plea must be vacated because he reasonably relied on inaccurate information and advice from the government and, had he received accurate information and advice, he would not have pled guilty.

Pursuant to this order, El–Nobani's plea and conviction are now a legal nullity. The Immigration and Naturalization Service is enjoined from using that conviction in any deportation or removal proceedings. The government is, of course, free to try El–Nobani on all of the charges in the original indictment and the government is no longer bound by any terms of the plea agreement.

This order is final and appealable.

IT IS SO ORDERED.